## WORLD FIRE & MARINE INS. CO. v. CAROLINA MILLS DISTRIBUTING CO.

### No. 13699.

United States Court of Appeals
Eighth Circuit.

Sept. 17, 1948.

William S. Hogsett, of Kansas City, Mo. (Alvin C. Trippe and Hale Houts, both of Kansas City, Mo., on the brief), for appellant.

Sam Mandell, of Kansas City, Mo. (Tyree G. Newbill, W. Arnold Brannock, and Arthur C. Popham, all of Kansas City, Mo., on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and COLLET, Circuit Judges.

COLLET, Circuit Judge.

From a judgment in favor of appellee in an action on an insurance policy, tried by the Court without a jury, this appeal is prosecuted.

Appellee operated a textile business at 814-16 Delaware Street, Kansas City, Missouri. It stored a large quantity of valuable merchandise in the basement of the building. Desiring to be indemnified againts loss from injury to that merchandise should it be damaged by water, appellee purchased from appellant a "Water Damage Policy" of insurance. On June 22, 1947, while that policy was in effect there was an unusually heavy rain. As a result, the city's main sewer located under the surface of the street in front of appellee's building became overloaded and the resulting pressure in that sewer caused water therefrom to flow back through a soil pipe connecting the plumbing system in appellee's building with the city sewer. The pressure extended up into the plumbing system inside the building and caused a metal cap covering an opening in a portion of the plumbing system, called a "house trap", located in the basement, to be broken and forced off with the result that the basement was flooded and appellee's merchandise was damaged to the extent of $72,604.83 by the water escaping from the broken "house trap". There were no toilets or other openings in the plumbing

system in the basement of the building. It is clear from the evidence that had the cap on the "house trap" not broken, the pressure from the overloaded main sewer would not have forced the water from that sewer high enough in the plumbing system inside the building to overflow from toilets on the first floor of the building, and no damage would have resulted from the pressure in the city's main sewer. It is equally clear that it was the pressure of the water from the overloaded city sewer in the street outside the building which forced the cap off of the "house trap". Other portions of the basement having a similar trap and being subjected to the flood pressure from the city's main sewer were not overflowed.

The policy of insurance provided on its face that appellant insured appellee— "* * * against all direct loss and damage caused solely by the accidental discharge, leakage or overflow of water or steam from within the following source or sources: Plumbing Systems (not including any Sprinkler System), Plumbing Tanks (for the storage of water for the supply of the plumbing system), Heating system, Elevator tanks and Cylinders, Stand Pipes for Fire Hose, Industrial or Domestic Appliances, Refrigerating systems, Air Conditioning Systems, and Rain or Snow Admitted Directly to the Interior of the Building through Defective Roofs, Leaders or Spouting, or by Open or Defective Doors, Windows, Show Windows, Skylights, Transoms or Ventilators, except as herein provided, * * *"

On the back of the policy was the following stipulation: "Wherever in this policy the term 'Water Damage' occurs, it shall be held to mean the accidental discharge, leakage or overflow of water, steam, rain or snow from systems, tanks, appliances and parts of buildings, insured against as sources of loss, resulting in loss or damage to property described herein, whether the 'Water Damage' originates in the portion of the building occupied by the insured or not."

If the above-quoted language constituted the only provisions relevant to appellee's loss, the action of the trial court in entering judgment in favor of appellee for the amount of its loss would be clearly correct because, as that court found, the loss was "directly" and "solely" caused by the breaking of a bolt which held the cap on the "house trap" (a portion of the plumbing system) in place, causing an accidental discharge, leakage or overflow of water from the plumbing system.

But on the back of the policy there was the following exception: "This Company shall not be liable for loss or damage caused directly or indirectly, * * * by floods, inundation, backing up of sewers or drains, or the influx of tide, rising or surface waters; * * *"

Appellant argues ably and forcefully that the damage was not caused solely by the accidental discharge of water from appellee's plumbing system, but that it was at least indirectly caused by the backing up of the water in and from the city's main sewer and hence fell within the above-quoted exception.

Much can and has been said pro and con on the subject of the proper construction to be given the insuring clause and the exception. The trial court reached the conclusion that there was no ambiguity in the contract and that the exception did not apply to the facts in this case. 75 F. Supp. 606. Appellant sees no ambiguity in the language of the policy and no conflict between the insuring clause and the exception, but reaches an opposite conclusion.

If the policy under consideration was one in which the insuring clause was general in its coverage and the exception relied upon by appellant merely carved out of the general class of contingencies covered by the insuring clause a specific class of losses which were to be excepted, appellant's position that there was no ambiguity and that the excepting clause excluded the loss from coverage would be more tenable. Instances of such practice in the drawing of contracts, and legislation are frequent. The case of Sulzbacher v. Travelers Ins. Co., 8 Cir., 137 F.2d 386, relied upon by appellant, is illustrative of cases involving such contracts.

The entire contract must be considered in determining the meaning of each

integral part. When so considered it is obvious that the insuring clause was both specific and definite. It did not merely insure against water damage in general terms and leave the door open to the exception of water damage caused by some particular instrumentality without conflict with the general insuring clause. It narrowed the water damage covered to certain carefully circumscribed types of water damage. Included in those narrowly defined types of damage covered was the damage involved in this case—"damage caused solely by the accidental discharge, leakage or overflow of water * * * from within the * * * Plumbing Systems * * *". And the scrivener who drew the contract did not stop with confining the water damage covered to such damage as might result from leakage from the plumbing system. The contract even provided that the damage to be covered would have to be the result of water coming from *within* the plumbing system. Nor did it stop there. It excluded Sprinkler Systems from the category of Plumbing Systems. Possibly the ingenuity and resourcefulness of an acute intellect trained in the art of circumscribing insurance coverage could supply additional limiting clauses. But the contract before us describes the coverage with sufficient particularity to compel the conclusion that the damage directly resulting from the accidental discharge of water from within the plumbing system was covered by the insuring clause of the contract.

Since the insuring clause clearly and specifically covered the loss, the existence of the excepting clause presents two possible alternatives, each of which leads to the same result. It—the excepting clause—is either in irreconcilable conflict with, and repugnant to, the insuring clause, or, it must be so construed that its meaning will be harmonized with the insuring clause.

■■ If the excepting clause be construed as applying to the state of facts in this case, as appellant contends, an irreconcilable conflict must exist between its meaning and the insuring clause, with the result that the contract must be found to be ambiguous. In that event the contract will be construed favorable to the insured who did not prepare it. The application of the latter rule of construction would lead to striking down the excepting clause and an affirmance of the judgment. But neither of the parties appears to have presented the theory of an irreconcilable conflict to the trial court, and neither of them presents it in this court. Nor did the trial court base its judgment on that theory. Under the peculiar facts of this case there may well be an irreconcilable conflict between these two pertinent provisions of this contract but, other than in exceptional cases, it is undesirable that an appellate court determine a cause upon a theory or issue which has neither been considered by the trial court nor advanced by either of the litigants. We find it unnecessary to do so in the present case.

■■ Although, as stated in Sulzbacher v. Travelers Ins. Co., supra, 137 F.2d loc. cit. 391, "The rule requiring the construction of an insurance policy favorable to the insured in cases of ambiguity does not justify a strained interpretation of the language of the contract in order to create an ambiguity where none exists", it is a well known rule of construction of insurance contracts that when a possible ambiguity exists, seeming contradictions must be harmonized away if that course be reasonably possible. Mathews v. Modern Woodmen, 236 Mo. 326, 139 S.W. 151, Ann.Cas.1912D, 483.

■■ The excepting clause here involved appears in the contract in a paragraph dealing with subjects not ordinarily connected with plumbing systems within a building. Those subjects range from seepage through the building walls, floods, inundation, the influx of tides, surface waters, gases, fumes or vapor, fire, lightning, cyclone, tornado, windstorm, hurricane, earthquake, blasting, invasion, insurrection, riot, civil war or commotion, rising temperatures or explosion, to injuries caused by military or usurped power.[1] Every part of the contract should, if

---

[1] "Hazards Not Covered.

"This Company shall not be liable for loss or damage caused directly or indirectly, (a) by seepage, leakage or influx of water through building walls, foundations, lowest basement floors, sidewalks

reasonably possible, be given effect, Sulzbacher v. Travelers Ins. Co., supra, and the holding that any part of it must be disregarded should be avoided, except in the most extreme situation. It is not unreasonable to assume that the loss or damage intended to be excepted by the words "backing up of sewers or drains" was, like the other losses excepted in this paragraph, such losses as would result from causes having no connection with the plumbing system, or from the discharge of water "outside" the plumbing system (as distinguished from "within" the plumbing system) such as the backing up of an open sewer in a basement. The trial court in effect gave the excepting clause that construction and concluded that it did not apply to the facts in this case. Such construction is, for the reasons heretofore noted, not an unreasonable one. Any flooding of the basement from the backing up of the sewer which did not bring about an accidental discharge or overflow of water from the enumerated fixtures would not have been covered by these provisions of the policy, but where there was an accidental discharge from within the plumbing system caused by the pressure of backing-up waters from the outside, there would, nevertheless, be liability. Such a construction of the entire contract gives effect to both provisions of the policy.

Appellant contends that the pressure from the city's overtaxed main, and the "backing up" of water therefrom, was the "indirect" cause of the breaking of the cap on the "house trap" and that for that reason the excepting clause must apply and exclude liability. The exception excluding liability if loss resulted "indirectly" from the backing up of water from the city's main sewer is no more susceptible of application to the facts in this case than the exception excluding liability for loss caused directly by the backing up of sewers or drains, for the reason heretofore stated. The excepting clause in its entirety did not apply when, as here, there was an accidental discharge of water from within the plumbing system. The contract cannot, without ambiguity or conflict between its provisions, be held to say that it covers loss caused directly from the accidental discharge of water from within the plumbing system and at the same time be construed to mean that, although the accidental discharge from within the plumbing system directly caused the loss, nevertheless such loss would not be covered if another factor indirectly caused the accident. A similar argument was advanced in Maryland Casualty Co. v. Razook, 5 Cir., 24 F.2d 160 and Williamsburgh City Fire Ins. Co. v. Willard, 9 Cir., 164 F. 404, 21 L.R.A., N.S., 103. In the Razook case [24 F.2d 161], the policy contained an excepting clause excluding liability for damage caused "directly or indirectly" by cyclone, tornado or windstorm. The damage was caused by the breaking of windows by a windstorm and the entry of rain accompanying the wind. The court there held that the loss was caused by the rain as an intervening, independent cause of the damage and not indirectly by the excepted cause—the windstorm. In the Willard case [164 F. 405], the policy contained an exception that the insurer should not be liable for loss caused "directly or indirectly" by earthquakes. The court held that, construing the policy most strongly against the insurer, the exception did not exempt the insurer from damage caused by fire although the fire was originally started by an earthquake. Likewise, in this case the breaking of the cap on the "house trap" must be regarded as the independent cause of the water damage, especially when, as heretofore pointed out,

---

or sidewalk lights; or (b) by floods, inundation, backing up of sewers or drains, or the influx of tide, rising or surface waters; or (c) by any gases, fumes or vapors; or (d) by fire, lightning, cyclone, tornado, windstorm, hurricane, earthquake, blasting, invasion, insurrection, riot, civil war or commotion, or by military or usurped power, or by order of any civil authority or by theft; or (e) by rising temperatures; or (f) by explosion (including explosion of refrigerating and air-conditioning systems and explosion or rupture of steam boilers and fly wheels); or (g) by neglect of the insured to use all reasonable means to save and preserve the property at and after a 'Water Damage.'"

the pressure from the city's main sewer could not have caused damage had the cap not broken.

Appellant advances the argument that the parties to the contract construed the excepting clause as applying independently of the insuring clause and without conflict therewith because a slight loss was incurred from water seeping through the basement walls soon after the policy was issued and appellee, recognizing that clause "(a)" of the paragraph of exceptions (heretofore set out in the margin) excluded such loss from coverage, applied for and paid an additional premium for a rider covering loss from seepage through basement walls but left the exception excluding losses from backing up of drains or sewers in the policy. Appellant contends that therefore appellee knew and understood that losses from water backing up from outside drains or sewers were not covered and so construed the policy. The record does not justify the emphasis appellant gives to this argument. Appellee's President testified on cross examination:

"Q. Now, you had to do with buying this policy of insurance, didn't you? A. Well, Mr. Hanna was the auditor of the firm and he checked on the insurance policies.

"Q. No, but Mr. Anderson, you saw this policy of insurance before you had your flood loss, didn't you? A. No, I didn't, I will be honest.

"Q. Well, I am expecting you to be reasonably honest. A. Well, I did not see the policy because I never paid any attention to those because Mr. Hanna was down there and he handled all those things.

"Q. Did you have anything to do with buying this endorsement on August 20, 1946 after the policy was written on June 26, 1946? Did you have anything to do with buying that? A. Yes, I would have to O. K. it if it was bought.

"Q. Now, you bought that, you O. K.'d it. Now, the reason you bought that was before you had this flood loss, a month or so before, you had a small water loss by water seeping through the walls, didn't

you? Don't you remember that? A. Yes, I remember we had the seepage through the walls.

"Q. And you took it up with the insurance company, this company, and you were told that that policy didn't cover that. So then you bought this endorsement that is dated August 20, 1946, so it would cover water seeping through the walls, didn't you? A. Yes.

"Q. Sir? A. It was bought by our firm.

"Q. So when you bought that endorsement you knew that it was excluded from the policy, but when you paid and bought that endorsement you kept the endorsement in the policy excluding any loss from backing up of drains or sewers, the very next paragraph? A. There wasn't any drains in our basement.

"Q. You knew when you got that endorsement that exclusion was in that policy right below the one you had cut out by the endorsement, didn't you?

\*    \*    \*    \*    \*    \*

"A. I don't remember."

The insurance agent who handled the issuance of the policy testified that it was the understanding when it was originally purchased that it should cover damage from water mains, hydrants and outside mains, and he so informed appellant's State Agent, but that when the policy was written and forwarded to the local agent from appellant's main office at Chicago, that coverage not being included, he, the local agent, immediately called the State Agent and caused the endorsement to be issued, and that *that* was the reason the endorsement bore a later date than the original policy. It therefore does not appear with any definiteness that the rider was placed on the policy as a result of any understanding between the parties that the construction of the excepting clause placed upon it by appellant was the proper construction to be given it.

The trial court allowed appellee $7,260.48 damages and $14,520 attorney fees on the ground that appellant's refusal to pay the loss covered by the policy was vexatious

within the meaning of that term as used in Section 6040, R.S.Mo.1939, Mo.R.S.A.[2]

The finding that appellant's refusal to pay the loss was vexatious appears to have been predicated on the factual conclusion stated in the trial court's memorandum opinion that in denying liability appellant gave no reason therefor. The Missouri authorities recognize an insurance company's failure to give any reason for denying liability as evidence of vexation. Frangos v. Hartford Accident & Indemnity Co., Mo.App., 203 S.W.2d 894, 898; Evans v. Great Northern Life Ins. Co., 237 Mo.App. 317, 167 S.W.2d 118, 125; Saffran v. Rhode Island Ins. Co., Mo.App., 141 S.W.2d 98, 101. The finding of the trial court may not be disturbed unless clearly erroneous, Rule 52(a) Federal Rules of Civil Procedure, but the only evidence on the question of whether any reason was given for denial of liability was the testimony of appellant's insurance adjuster and an allegation in appellee's original petition. The testimony of the adjuster on direct examination was:

"Q. Now, after you had made your investigation there and they discovered that this loss was caused by this drain, the sewer backing up, did you deny liability? A. Yes, sir, we did.

"Q. From then on when with reference to the time you made your investigation did you advise these people this insurance company felt it had no liability for this loss? A. I am unable to state certainly on that, but I think it was about the third or the fourth day.

"Q. And from that time on you had— have you had anything to do with it from that time on? A. No, sir.

"Q. All right. That is all."

And on cross-examination:

"Q. Whom did you say that to, that the Company denied any liability for the loss? A. Mr. Campbell and Mr. Hart.

"Q. You understood that they were connected with the plaintiff company in this case? A. Yes, sir.

"Q. I assume you had been down there several times in the basement before you said that to them? A. Well, I think I only went down there twice, Mr. Popham. I am not real sure.

"Q. And you stated, what you said to them, that the Company denied any liability in this loss? A. Yes, sir."

It will be readily observed from the foregoing questions and answers that the witness was not asked and did not say whether he explained to appellee's representatives that the reason appellant was denying liability was because the witness concluded from his investigation that the damage had been caused by water backing up from the city's main sewer and escaping through the broken cap on the "house trap" and hence was not covered by the policy. There can be no reasonable inference drawn from his testimony that he did not explain the reason for the denial of liability. But appellee's petition leaves the strong inference that the witness did do so. In that petition appeared the following paragraph: "4. That the said defendant on the 26th day of June, 1947, after the occurrence of said water damage and loss, notified the plaintiff that it was not liable upon said policy for the reason that said loss was a hazard not covered by said policy and thereby defendant waived the presentation of plaintiff's proofs of loss and thereby waived any clauses in said policy as to the time of filing suit to recover."

Although four days after the trial appellee was permitted to delete the entire paragraph and interline in lieu thereof: "That

---

[2] "Sec. 6040. Damages, when recoverable. In any action against any insurance company to recover the amount of any loss under a policy of fire, cyclone, lightning, life, health, accident, employers' liability, burglary, theft, embezzlement, fidelity, indemnity, marine or other insurance, if it appear from the evidence that such company has vexatiously refused to pay such loss, the court or jury may, in addition to the amount thereof and interest, allow the plaintiff damages not to exceed ten per cent on the amount of the loss and a reasonable attorney's fee; and the court shall enter judgment for the aggregate sum found in the verdict."

the said defendant on the 26th day of June, 1947, denied all liability to the plaintiff upon said policy", appellee still did not charge that the denial of liability was without any explanation of the reason therefor and obviously from the allegation in the petition as originally drawn some one advised appellee and its counsel what appellant's position was before the suit was filed. We find no justification in this record for the finding that the failure to pay the loss under this policy was vexatious. The Missouri courts have never construed this statute as justifying a penalty when there was ample ground for an honest difference of opinion as to liability. See Western Fire Insurance Co. v. University City, 8 Cir., 124 F.2d 698; Commercial Casualty Ins. Co. v. Fruin-Colnon Contracting Co., 8 Cir., 32 F.2d 425. There was ample ground for such a difference of opinion in this case. Hence we find no justification on any ground for the allowance of the penalty or attorney fees.

The judgment is modified by striking therefrom the allowance of damages and attorney fees, and as so modified the judgment is affirmed.