**FIREMAN'S FUND INSURANCE COMPANY OF SAN FRANCISCO, California, a California Corporation, Appellant,**

v.

**Joseph A. HANLEY and Ruth C. Hanley,**
Appellees.

**No. 13201.**

United States Court of Appeals
Sixth Circuit.

Feb. 25, 1958.

J. T. Hammond, Benton Harbor, Mich., and Herbert R. Stoffels, Chicago, Ill., for appellant.

Harold S. Sawyer, Grand Rapids, Mich. (Harold S. Sawyer, Warner, Norcross & Judd, Grand Rapids, Mich., John T. Ryan, St. Joseph, Mich., on the brief), for appellees.

Before ALLEN and MILLER, Circuit Judges, and BOYD, District Judge.

ALLEN, Circuit Judge.

■   This appeal arises out of an action on an insurance policy for the destruction by landslide of a residence and real property located in St. Joseph, Michigan. The residence occupied the top of a bluff some 80 feet high overlooking the lake. The jury returned a verdict for plaintiffs [1] upon which judgment was rendered.

The case arises out of the following facts which, in general, are not in controversy:

On March 13, 1954, plaintiffs, husband and wife, purchased an insurance policy from defendant insuring the property against "All Physical Loss" except that covered by certain exclusions contained in Section III, the pertinent portions of which are as follows:

"Exclusions: This Policy Does Not Insure Against: * * *

"B. Loss by termites or other insects; deterioration; smoke from industrial operations; rust, wet or dry rot; mould; mechanical breakdown; normal settling, shrinkage, or expansion in walls, floors or ceilings; this Exclusion, however, shall not apply to loss by Fire, Smoke (except as specifically excluded above), Explosion, Landslide, Total or Partial Collapse, Water Damage, and Glass Breakage, caused by perils excluded in this paragraph;

"C. Loss by surface waters, flood waters, waves, tide or tidal wave, high water, or overflow of streams or bodies of water, all whether driv-

1. The parties will be designated as in the court below.

en by wind or not; this Exclusion, however, shall not apply to loss by Fire or Explosion caused by perils excluded in this paragraph;"

For many years prior to 1954 there were severe storms on Lake Michigan. For several years the level of the lake had been unusually high. Waves and high water were driven by winds against the bluff on which plaintiffs had built their house. Especially heavy storms occurred during 1951, 1952 and 1953. The action of the waves, combined with the high water, created extensive erosion along the shore line in the vicinity of St. Joseph, Michigan. Before he secured the insurance in 1948 plaintiff, Joseph Hanley, had partially constructed a seawall and jetty to protect the property and restore the beach. He completed these about the same time that he secured the insurance from defendants in 1948. During 1951, 1952, and 1953 land on the bluff sloughed off into the lake from time to time and five houses in the area were either destroyed or moved for safety. By the spring of 1954, due presumably to the protective structures in the lake built by land owners, a 30 to 40 foot sand beach had been established at the foot of the bluff below plaintiffs' property. The toe of the bluff during that period was not washed by the waves. In fact, a bulldozer, a crane and other equipment used in building the seawall at the foot of the bluff were stored upon the beach. The bluff was precipitous and about 20 to 30 feet from the top there was a horizontal stratum of clay-sand which regularly carried and at times emitted ground water. At the end of September, 1954, 16 days of exceptional rainfall occurred during which 8.-67 inches of rain fell in the area. During this period the rain percolated into the ground or drained off from plaintiffs' premises, which were higher than and sloped down to the adjoining real property.

On October 13, 1954, a landslide in the upper portion of the bluff cut off some 5 feet of the lawn facing the lake. On October 17, 1954, a large landslide occurred at the rear of plaintiffs' property covering an area of about 30 feet from east to west and an even greater distance north and south roughly following the shore of the lake. The landslide took off about 40 feet at the top of the 80-foot bluff. The entire rear portion of plaintiffs' house was undermined. Large cracks appeared, the floors tilted, and eventually the structure was a total loss. Plaintiffs made diligent efforts to secure the removal or salvage of the house but no one would attempt to move it from the top of the bluff. Some ten months later the roof of the house blew off. It was subsequently sold for salvage for a net sum of $1,020. On October 26, 1954, after the entire loss had accrued, defendant cancelled the policy in accordance with its provisions.

Under plaintiffs' insurance contract replacement cost was the measure of damages. This was figured in the policy at $30,000. The policy also provided for reimbursement of amounts actually expended in securing other living quarters and additional living expenses. Testimony was given to the effect that the replacement value of the house at the time of the loss was $29,000 and additional living and other recoverable expenses were shown to be $562.61. A mortgage existed on the property upon which $8,000 was still due when the loss occurred. Following the removal of plaintiffs and sale of the house the mortgage was foreclosed. Under the instruction of the court the jury deducted the net salvage payment and returned a verdict for plaintiff in the sum of $26,792.-61.

Defendants claim (1) that the charge of the court constituted reversible error; (2) that, in view of the fact that the destroyed property was subject to a mortgage under which a balance of $8,-000 was unpaid at the time of the loss, $8,000 should have been deducted from the amount of the verdict; and (3) that plaintiffs are not entitled to recover damages on the basis of replacement

value because they attempted in 1954 to sell the property for $20,000.

The principal question is whether the District Court committed reversible error in instructing the jury as follows with reference to the existence of liability:

"Testimony has been presented in this case from which the jury could find that the damage to the plaintiffs' property resulted from causes within the coverage of the policy, and testimony has been presented from which the jury could find that the damage resulted from causes excluded from the coverage of the policy; and testimony has further been presented from which the jury could find that the damage may have resulted from a combination, concurrence, and working together of causes within the coverage and causes excluded from the coverage of the policy.

"Therefore, the court instructs the jury that if you find as a fact that the damage to the plaintiffs' property resulted from a combination, concurrence, and working together of causes within the coverage of the policy and causes excluded from the coverage of the policy, the court instructs you that the plaintiffs are entitled to recover in this action."

Defendant contends that the dominant cause of the loss was not the landslide, but the long-continued erosion of the shore line due to high water and the action of the wind and waves. It argues that, due to the long existence of this condition, it was inevitable that plaintiffs' house would be destroyed and therefore the general term "All Physical Loss" did not insure against the risk of landslide because it was not fortuitous. Appleman on Insurance Law and Practice, Vol. 5, section 3272; Richards on Insurance, 5th Edition, Vol. 2, Sections 206, 212. Defendant urges in effect that under the decision in Aetna Insurance Company v. Boon, 95 U.S. 117, 24 L.Ed. 395, an admittedly excluded risk such as damage caused by waves, high water or surface water, combining with a covered factor such as landslide, does not establish liability against the insurer.

In the Boon case, supra, a fire insurance policy had been issued upon plaintiff's merchandise located in a store at Glasgow, Missouri. The policy provided that the company should not be liable for damage by fire which might "happen or take place by means of any invasion, insurrection, riot or civil commotion, or of any military or usurped power * * *." The city of Glasgow at the time of the fire was occupied by the United States military forces. It was attacked by Confederate armed forces. In the ensuing battle United States troops set fire to the city hall to prevent the capture of important military stores. The fire spread and eventually destroyed the building in which plaintiff's insured goods were located. The United States Circuit Court allowed recovery, but the Supreme Court of the United States reversed the judgment and ordered that judgment be entered for the defendant. It held that the Confederate invasion was the "predominating and operative cause" of the fire which occurred while the attack was in progress. It pointed out that the attack never ceased to operate as a cause until the loss was complete, that it created the military necessity for the destruction of the military stores, that the fire which destroyed the property was caused by an invasion by military or usurped power and was specifically excepted from the risk undertaken by the insurer.

We recognize that the Boon decision is an authority followed in numerous lower court decisions presenting identical or closely similar policy provisions and closely similar facts. However, we think that case is not controlling here. The insurance policy construed in the Boon case contained an exclusive provision which was clear and unambiguous. Moreover, the facts are not closely similar to those herein presented. In the Boon case the court emphasized the fact that when the fire destroyed plaintiff's

goods the attack of the Confederates was in progress and declared that the invasion and the attack compelled and caused the fire. Also, the court held that the loss fell within the precise terms of the policy above quoted.

Defendant contends that, applying the rule in the Boon case, supra, it was shown herein that the cause of the landslide was an excluded risk, namely, high water, surface water and waves driven against the bluff, inducing over a period of years erosion on the shore line.

As to surface water, this contention may be readily disposed of. While the prolonged rain temporarily produced surface water, there is no testimony that the surface water caused any damage. Part of the water percolated into the bluff and part of it simply was not retained on the property but ran off, as plaintiffs' land sloped from the lakeside to the highway. As held by the Michigan Supreme Court, Fenmode, Inc., v. Aetna Casualty & Surety Company, 303 Mich. 188, 6 N.W.2d 479, surface waters are lost by percolation, evaporation, or by reaching some definite water course. One expert testified that, when water has gone into the ground one inch, geologically it is considered ground water. The proved emission of ground water from the stratum of sand on the face of the bluff after the prolonged rain indicates that to a large degree the heavy rain was converted into ground water.

As to the action of the high water of Lake Michigan and of the waves, defendant introduced convincing testimony from experts, two of whom had been connected with the United States Army Corps of Engineers and had made extensive investigations of the erosion problem in this particular area. They stated that for many years the high water and the waves of the lake had caused erosion upon the entire shore line. One expert said that this erosion continued as the primary cause of the landslide up to and including the time of the loss. He also stated that landslide was bound to occur on plaintiffs' land, thus supporting defendant's contention heretofore set forth that landslide on plaintiffs' property was inevitable and hence was not a risk for which recovery could be had.

But the testimony that landslide was inevitable was strongly controverted by the undisputed facts. Both the C. & O. Railroad and the Michigan highway authorities had built structures for protection along the shore line. The C. & O. constructed jetties which protected its tracks. Moreover, the United States Army Corps of Engineers sent experts repeatedly to groups of persons dwelling in the area to instruct them as to the different kinds of protective structures which could be used in this situation, their proper method of erection, and the cost. The reasonable inference from this official advice to residents of the area is that destruction was not inevitable. Jetties and seawalls had been built by plaintiffs and other landholders long prior to this particular loss. It is a fair inference that these structures below plaintiffs' property were so effective that the beach line was extended and large equipment was kept on the beach for safety. The testimony on this point raised a question of fact. We conclude that the jury was justified by ample evidence in finding that the destruction of plaintiffs' house was not inevitable, that if the unusually heavy rain had not occurred the jetties and seawalls might have continued to arrest the erosion and protect the bluff.

This case presented evidence from which the jury presumably found that the erosion and action of high water, surface water and waves were not predominant and efficient causes of the landslide. These factors did not, like the factors in the Boon case, operate on plaintiffs' property at any time during or near the time of the loss. The toe of the bluff had been for some time protected by the structures in the lake and by a gradually built sand beach of 30 to 35 feet.

Experts for both parties testified that the landslide directly caused the injury and substantial evidence was given to the effect that the sustained rainfall directly

caused the landslide. The latter conclusion was supported by the fact that part of the bluff which fell off in the first landslide, October 13, 1954, roughly corresponded to a layer of the clay situated above the stratum of sand-clay which had emitted ground water over a period of years. The weight of the water percolating in the soil, which was largely clay, estimated by one expert as being about 113 tons of water on an acre of ground, produced by one inch of rainfall, may have caused great sections of clay to slough off and fall down the bluff. These chunks pushed the bulldozer some 75 feet into the lake. Defendant's expert testified that stratified beds of sand or gravel overlying clay constitute a condition favorable to seepage and sliding. He said that underground water softens clay and at the same time increases the weight of the material affected.

Defendant's counsel conceded at the close of the charge that there are two lines of decision governing situations of this kind and that the court followed one of these established lines. The charge of the court quoted above upon these features of the case follows Pearl Assurance Company, Ltd., v. Stacey Brothers Gas Const. Co., 6 Cir., 114 F.2d 702. This case holds that where a policy expressly insures against direct loss and damage by one element but excludes loss or damage caused by another element, the coverage extends to the loss even though the excluded element is a contributory cause. To the same effect is Jordan v. Iowa Mutual Tornado Insurance Co. of Des Moines, 151 Iowa 73, 130 N.W. 177. Cases cited by defendant follow: Chute v. North River Insurance Co., 172 Minn. 13, 214 N.W. 473, 55 A.L.R. 938; Russell v. German Fire Insurance Co., 100 Minn. 528, 111 N.W. 400, 10 L.R.A.,N.S., 326; Newark Trust Co. v. Agricultural Insurance Co., 3 Cir., 237 F. 788; National Fire Insurance Co. v. Crutchfield, 160 Ky. 802, 170 S.W. 187, L.R.A.1915B, 1094.

In the cases covered by defendant's citations, including the Boon case, supra, the insurer writing the policy made express and clear the exclusions relied on as defeating liability. Here the policy with reference to the exclusions and exceptions quoted above is unusually ambiguous. Exclusion B relates to such risks as loss by termites, deterioration, mechanical breakdown, normal settling of a house. This exclusion expressly excepts landslide, but loss due to termites, deterioration or mechanical breakdown, etc., would very seldom, if ever, combine with landslide to create a loss. " * * * normal settling, shrinkage, or expansion in walls, floors or ceilings" is the only risk excluded in paragraph B that appears to have connection with landslide. And yet it is highly doubtful whether landslide would ever create a "normal settling." The express exclusions of paragraph B indicate that landslide may be expressly excepted from these exclusions by inadvertence.

On the other hand, paragraph C does not include landslide, either among the exclusions or exceptions. Defendant argues that because of this omission the meaningless inclusion of landslide as an exception in paragraph B raises a strong inference that landslide was not included in the exceptions under paragraph C because it was intended specifically to be an excluded loss, such as surface water, flood waters, waves, tide or tidal wave, high water. If this was defendant's intention it could easily have listed landslide among the exclusions of paragraph C. Defendant's contention ignores the rule that an ambiguous provision in an insurance policy should be read against the insurer, who writes the policy. Turner v. Fidelity & Casualty Company of New York, 112 Mich. 425, 429, 70 N.W. 898, 38 L.R.A. 529.

It is said that because the risk insured against herein is in general terms "All Physical Loss," the ambiguity rule should be relaxed, on the authority of World Fire & Marine Insurance Co. v. Carolina Mills Distributing Company, 8 Cir., 169 F.2d 826, 828, 4 A.L.R.2d 523.

The court there in discussing the insurer's contentions stated that "If the policy under consideration was one in which the insuring clause was general

in its coverage and the exception relied upon by appellant merely carved out of the general class of contingencies covered by the insuring clause a specific class of losses which were to be excepted, appellant's position that there was no ambiguity * * * would be more tenable." This statement plainly has no application here. It is not a holding but merely a recognition by the court of the insured's argument. Here defendant asks us to write "landslide" in the exclusions of paragraph C in which paragraph "landslide" is not mentioned at all.

We think the insurer is under at least as high an obligation to be precise and clear in drawing the policy when dealing with risks described in general terms as when the risks insured against are precisely itemized. The insured will have more difficulty in threading through the mazes of exclusions relating to a general comprehensive coverage than in properly appraising exclusions which relate to coverage of specific risks.

■ The instant case falls directly within the established principle that exclusion clauses will be strictly construed and any ambiguity will be resolved against the company. Feeney & Meyers v. Empire State Insurance Co. of Watertown, New York, 10 Cir., 228 F.2d 770; World Fire & Marine Insurance Co. v. Carolina Mills Distributing Co., supra; Prudential Insurance Co. of America v. Carlson, 10 Cir., 126 F.2d 607; Commercial Casualty Insurance Co. v. Stinson, 6 Cir., 111 F.2d 63.

Since testimony was given to the effect that the erosion was the dominant cause of the landslide and this testimony was controverted by substantial evidence, the court's charge, which recognized the conflicting theories of the parties, did not constitute reversible error. Under the undisputed facts there was no wave action operating against the toe of the bluff at or near the time of the landslide. The slide occurred in the top portion of the bluff, being connected with the clay-sand layers which existed therein. The jury evidently found that the factors causing the landslide at or near the time of the loss were the constant rainfall, the increase of weight from water percolating into the clay and the presence of a huge weight of ground water in clay-sand strata lying 20 to 30 feet below the top of the bluff.

We do not discuss the question as to the unpaid balance on the mortgage. It does not appear that any objection was made by defendant to the instructions of the court on this point. The appendix contains no pleading raising the question. After the charge defendant, in entering its objection to the court's failure to give requested instructions and to any instructions given, stated "the court has denied the requests of the defendants, Nos. 2, 3, 5, and 7, at least in part" and took exception to this action of the court.

This appendix presents nothing which connects the requests to charge above listed with the point as to the unpaid balance on the mortgage. Since defendant gives the court no assistance in connecting the requests refused or partially refused, to which objection was made, with the contention as to the unpaid balance on the mortgage, and points out no pleading where this particular point was urged, we have no basis for concluding that the objection was properly raised. Rule 12(h) and Rule 51, 28 U.S.C., Federal Rules of Civil Procedure.

■ There is no merit in the further point that damages on the basis of replacement value should not have been allowed because plaintiffs had attempted, without success, to sell the property for $20,000. By specific agreement of the parties in the policy replacement value was the measure of damages. The fact that plaintiffs offered to sell the house for considerably less than replacement value has no bearing.

The judgment of the District Court is affirmed.