**WESTCHESTER FIRE INSURANCE COMPANY, Defendant and Appellant,**

v.

**William M. HANLEY and Lily V. Hanley, Plaintiffs and Appellees.**

**No. 13931.**

United States Court of Appeals
Sixth Circuit.

Nov. 29, 1960.

Redacted page — content not legible.

410

Samuel Levin, Chicago, Ill., for appellant, J. T. Hammond, Benton Harbor, Mich., on the brief.

Harold S. Sawyer, Grand Rapids, Mich., for appellees, Warner, Norcross & Judd, Grand Rapids, Mich., and Ryan & McQuillan, St. Joseph, Mich., on the brief.

Before CECIL and O'SULLIVAN, Circuit Judges, and BOYD, District Judge.

O'SULLIVAN, Circuit Judge.

Appellant, Westchester Fire Insurance Company, defendant below, appeals from a judgment entered upon a jury's verdict in the sum of $25,589.70. Plaintiffs, appellees, had been insured by appellant under an "All Physical Loss" policy covering plaintiffs' frame dwelling located on the shores of Lake Michigan near St. Joseph, Michigan. The parties shall be referred to herein as plaintiffs and defendant, respectively. Plaintiffs claimed they were damaged by a "landslide" occurring on October 16 or 17, 1954; such damages consisting, among other things, of expenses incident to moving of their house to a new location following the landslide and placing the dwelling in the condition it was in prior to the landslide. Plaintiffs claimed that after the landslide the home could not safely be repaired on its then lot and to mitigate the damages, as required by the policy, plaintiffs moved their home to another location, upwards of a mile away.

The policy excluded from its coverage loss from "surface waters, flood waters, waves * * * high water or overflow of streams or bodies of water, all whether driven by wind or not." The policy provided, among other things, that the company's loss should not exceed:

> "(b) The replacement cost of buildings or any part thereof identical with such buildings on the same premises and intended for the same occupancy and use.
>
> "(c) The amount actually and necessarily expended in repairing or replacing said buildings or any part thereof intended for the same occupancy and use."

Another provision of the policy was as follows:

> "G. Permission to Make Alterations and Repairs: In the event of loss hereunder, the insured is permitted to make reasonable repairs, temporary or permanent, provided such repairs are confined solely to the protection of the property from further damage * * * the cost of any such repairs attributable to damage by any peril insured hereunder shall be included in determining the amount of loss hereunder. Nothing herein contained is intended to modify the policy requirements applicable in case loss occurs, and in particular the requirement that in case loss occurs the Insured shall protect the property from further damage."

At a pre-trial conference, the following agreement was reached:

> "Defendant admits that if damage sustained as a result of such slides were covered, and if the policy in question was issued when the company had full knowledge of the facts, and if there was actual physical damage to the premises as a result of the slide in question, then and in that event, the reasonable cost of moving the structure to another location to mitigate damages would be covered by the policy in question. Defendant does not under any circumstances admit that all of the loss claimed was covered."

The policy also provided:

> "This entire policy shall be void if, whether before or after a loss the insured has wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto."

On the subject of apportionment of damages, between the defendant company and any other insurance in effect on the

premises at the time of the loss, the policy provided:

> "This company shall not be liable for a greater proportion of any loss from any peril or perils included in this form than (1) the amount of insurance under this policy bears to the whole amount of fire insurance covering the property, or which would have covered the property except for the existence of this insurance, whether collectible or not and whether or not such other fire insurance covers against the additional peril or perils insured hereunder."

The total coverage provided by the policy in question was $45,000.00. It was issued by defendant on May 26, 1954, following cancellation of a policy covering plaintiffs' premises which had been issued by Fireman's Fund Insurance Company. The Fireman's Fund policy as well as the policy in suit, as originally written, provided fire and extended coverage. On or about September 9, 1954, the "All Physical Loss" coverage was added by an endorsement to the policy in suit. The defendant asserted in its defense, among other things, the following:

(a) That plaintiffs' loss was not insured by the defendant's policy, in that it was caused by the undercutting of the bluff upon which plaintiffs' house was located by waves and waters of Lake Michigan, (specifically excluded from the coverage of the policy).

(b) That plaintiffs were guilty of false swearing in the proofs of loss submitted and in statements made by plaintiff William Hanley when examined under oath following the loss.

(c) That plaintiffs had fraudulently concealed, at the time of purchasing the insurance, their own knowledge of conditions that would have affected the insurance company's acceptance of the risks covered.

(d) That the damages claimed were excessive, unreasonable, and were not covered by the policy, even though the casualty was a covered risk.

The defendant company made a motion for directed verdict, claiming that its above defenses (a), (b) and (c) were established as a matter of law. For the same reasons, defendant moved for judgment notwithstanding the verdict. It moved for a new trial on the additional grounds of claimed error of the trial court in the rejection of evidence offered by defendant for failure of the trial court to declare a mistrial because of a prejudicial remark made by plaintiff William M. Hanley in the presence of the jury, because of the Court's charge, and its refusal to give certain instructions requested by defendant. These motions were denied.

Plaintiffs' home, an eighty year old frame dwelling, was located upon the high bluffs along the eastern shore of Lake Michigan in Berrien County, Michigan. For some years prior to the casualty in question, the protection of these bluffs was a matter of considerable concern to house owners, as well as to public officials of Michigan and the Federal Government. High water and action of waves upon them had resulted in a rather continuous falling and sloughing off of these high bluffs. By private and public action, studies were intermittently being conducted to find ways to prevent the continued erosion of the beach and the undermining of the bluffs upon which dwellings were located. Over a period of years there were numerous slides and crumblings, sometimes causing dwellings and other buildings to fall over the slope of the bluff. Evidence showed that the eroding and falling of the bluffs in the area of plaintiffs' property began in 1950 and continued through 1954. During this period, Lake Michigan experienced high water levels which, with the wave action, attacked the base of the bluffs along the shore.

Sometime during the night of October 16, or the morning of October 17, most of the ground in the rear of plaintiffs' home broke away, leaving the house on the new edge of the bluff.

The issue as to whether the loss was one within the coverage of the policy

was made between the contention of the defendant that the fall of the bluff was the result of the cutting into the bluff by the high water and waves of Lake Michigan, and the contention of plaintiffs that it was a landslide caused by water seepage following unusually heavy rains that fell for a period of several days prior to the night of the fall. The defense produced as witnesses to sustain its position, the persons who had been studying the shore problems over a period of years—Dr. Ernest F. Brater of the University of Michigan, Norman F. Billings, head of the Hydrology Division of the Michigan State Water Resources Commission, Sidney Drew of the U. S. Army Corps of Engineers, and George Foster, Chief Deputy Commissioner of the Michigan State Highway Department. Each of these gave his opinion that the cause of the fall of the bluff on October 16th or 17th, 1954, was the action of the waves of Lake Michigan striking against and undercutting the foot of the bluff.

To sustain its burden of proving that the proximate cause of the fall was one insured against, plaintiffs produced one witness. He was Dr. Elmar Walter, a twenty-eight year old professor from St. Joseph's College of Rensselear, Indiana. He was called to make an inspection of the scene of the casualty following its occurrence. This witness had studied at the University of Graz in Austria and in the United States under a Fulbright grant and research fellowship at Case Institute of Technology in Cleveland, Ohio. He had received degrees in geology and mineralogy. He had done some consulting work for some State Highway Department, and for some other governmental agencies. His first view of the premises in question was in November, 1954. He came to Michigan in 1954. He had no previous experience with lake levels or the problems of the erosion and destruction of the bluffs along the shore of Lake Michigan. In his research, he consulted none of the reports or studies that had been made by Michigan and federal agencies as to the history and causes of the falling away of the bluffs along the shore in question. The only record consulted by him was the Climatological Data of the United States Department of Commerce for the month of October, 1954. He gave his expert opinion that the cause of the fall was not erosion or weakening of the bluff by the high water or waves of Lake Michigan. It was his opinion that unusually heavy precipitation just before the fall, seeped into the ground—that the ground thus heavily laden with water, broke away and went over the bluff. Such cause of the falling of the bluff, if accepted as fact, was within the coverage of the policy sued upon. The jury, by its verdict, accepted the plaintiffs' version. Even though, if triers of the facts, we might have come to a different conclusion, we are satisfied that the plaintiffs' evidence was sufficient to sustain the jury's verdict.

Consequent upon the same casualty involved in this case, the home of plaintiffs' son, which was immediately to the south of plaintiffs' home, was substantially destroyed. Suit was brought upon an "All Physical Loss" policy covering the son's home. A jury gave a verdict for the plaintiff, and on review judgment thereon was sustained by this court. Fireman's Fund Insurance Co. of San Francisco v. Hanley, 6 Cir., 252 F.2d 780. While the terms of the policies involved in that case and this were not in all respects identical, the issue as to the cause of the fall was substantially the same in both cases. In holding that the jury could find that the cause of the fall was within the coverage of the policy, this court said at page 786:

> "The jury evidently found that the factors causing the landslide at or near the time of the loss were the constant rainfall, the increase of weight from water percolating into the clay and the presence of a huge weight of ground water in clay-sand strata lying 20 to 30 feet below the top of the bluff."

On the defense of fraud and false swearing, it was shown that in January, 1955, plaintiff William M. Hanley was examined under oath concerning the loss in question, its causes, and his knowledge of

the conditions that were the background to it. He was asked about the history of his property as related to erosion and the previous falling off of his land. He was asked about the policy in suit and the obtaining of it.

In answering such questions, Hanley stated that at the time he acquired the policy in suit, there were no conditions existing along the bluff of Lake Michigan which gave him worry as far as his lot was concerned and that he was not aware of the imminence of a landslide along his property. He stated that before the falling off of the bluff involved in this lawsuit, there was no appreciable amount thereof and that the collapse of October 16 was the first real collapse. He stated he had made no effort, prior to getting the Westchester Fire Insurance Company policy, to find out what was causing the edge of the bluff to fall, and had obtained no opinion concerning the subject. He said he had contacted no one to correct the situation in back of his house. There was, however, evidence on the trial that, known to Hanley, there had been a substantial falling of the bluff in back of his house in the spring of 1954 and at earlier times, and that Hanley had been active in various ways in seeking ways to protect his property from further erosion and falling away. He had written a letter to Michigan's Governor Williams in May of 1953 in which he used strong and colorful language to record his awareness of the dangers that beset his property because of the pounding of the waves and undercutting of the bluff. He requested Governor Williams to declare the vicinity of his home a "disaster area." It was further disclosed that plaintiff Hanley had been a member, commencing in 1951, of a committee known as the Lake Shore Erosion Committee. He testified that he could not recall any activity in 1954 in which he was a proponent, for taking action with reference to the problems of the shoreline. He was then reminded, and recalled, that in June, 1954, he was a member of a group that went to Washington, D. C., to appear before a sub-committee of the United States Senate. Included

in the party, and among those who appeared as witnesses, were a Colonel of the U. S. Engineers, an engineer from the Michigan Water Resources Commission, a Deputy Commissioner of the Michigan Highway Department, a Michigan Congressman, and Mr. Hanley. At such hearing, Mr. Hanley gave some history of the troubles that beset those who lived along the shore of Lake Michigan in the area of his home. Emphasizing the velocity of the waves on the part of the beach that was unprotected and the undercutting of the base of the bluff, he told the committee, "We have no value on our homes. * * * We are out of the picture. * * * We have no market value."

The "All Physical Loss" endorsement was put on Mr. Hanley's policy in September following his appearance before the Senate Committee in June. Mr. Hanley at no time gave any explanation of what, to some minds, might appear as discrepancies between what he said under oath in the examination of January, 1955, and at the trial, and his strong averments in his letter to Governor Williams and in his testimony before the sub-committee. His counsel's brief offers the explanation that his continuing to live in his home up to the fall demonstrated that he was not really concerned. Counsel likewise asks us to have in mind that when Mr. Hanley wrote to the Governor and testified before the Senate Committee, he was a "salesman" trying to get help for the people of the area. It is obvious that the jury was impressed with such explanation.

Based upon all of the foregoing, defendant moved for a directed verdict on its claim that, as a matter of law, plaintiffs had, when contracting for the insurance in question, been guilty of fraud in concealing from the defendant facts materially affecting defendant's acceptance of the risk, and that as a matter of law, plaintiff William M. Hanley had sworn falsely in his examination under oath in January, 1955. The Court submitted these issues to the jury, instructing them that if they found as a fact that the plaintiffs, or either of them, knowing-

ly or wilfully, with intent to defraud the defendant, concealed facts which affected the risk assumed, or made false statements in their proof of loss, or made false statements in the sworn testimony of William M. Hanley given in support of the proof of loss, relative to any material matters, then such false statements would constitute fraud and false swearing within the meaning of the policy of insurance and would void the policy.

Notwithstanding that, if triers of the fact, we might have come to a different conclusion than the jury, we are satisfied that the trial court properly submitted these issues to the jury upon authority of this court's holding in the case of Cooper v. Firemen's Ins. Co., 6 Cir., 148 F.2d 337, 338. There this court stated the applicable law of Michigan as follows:

> "It is the law of Michigan that in order to void a policy for fraud or false swearing the false swearing must have been done with an actual intent to defraud the insurer. Bernadich v. Bernadich, 287 Mich. 137, 144, 283 N.W. 5; Alma State Savings Bank v. Springfield Fire & Marine Ins. Co., 268 Mich. 631, 634, 256 N.W. 573; Perkins v. Century Ins. Co., 303 Mich 679, 7 N.W.2d 106. Indeed, so much the appellee concedes. It is also the law of Michigan that where misrepresentations or false statements are claimed to void an insurance policy, intent to defraud is a question of fact for the jury. Bernadich v. Bernadich, supra."

On the question of wilful and intentional concealment, we should note that there was evidence that defendant's agent, who sold the insurance, was in some measure acquainted with the condition of peril along the lake shore. It is true, also that on the question of materiality of the concealment of any such condition, the jury's verdict was a finding that the fall of the bluff in question was from a different cause than the condition of peril allegedly concealed from the defendant.

> "It is generally true that questions of the materiality and the fraudulent character of a concealment of facts are for jury determination, as is the question of intent to defraud where that issue is to be considered in determining whether the representations made have had the effect of avoiding the policy." Vol. 14 Michigan Law and Practice Insurance § 344, page 324.

Defendant, as ground for a new trial, charges that the amount of damages allowed by the jury was excessive and not warranted by the evidence. We are satisfied that there was sufficient evidence from which a jury could find that it was necessary in order to protect the property, to move the house from the site where it was following the casualty to a new location. The jury's award of damages was generous, but we are not persuaded that it was without evidence to support it.

Defendant further assigns error on the trial court's refusal to grant its motion for a mistrial on the ground of a claimed improper and prejudicial remark volunteered by plaintiff William M. Hanley while under cross-examination. Hanley was being examined generally upon his knowledge of the history of the falling off of the bluff along the lake shore and the experience of others in the loss of land and houses. His attention was being directed to a particular homeowner who had apparently moved his home across the highway because of the falling of the bluff. The following then occurred:

> "Q. And you knew the condition that caused him to move and you know that was the falling away of the bluff?
>
> "A. Yes, sir, *and I know he collected insurance on it.*"

Defendant's counsel moved that the answer be stricken and a mistrial declared. The last part of the answer was stricken, but the motion for mistrial was denied. The trial court concluded that while the remark was improper, whatever prejudice might have resulted therefrom could be cured by a cautionary instruction.

His instruction was complete and thorough.

Having in mind the issues of fact that were raised in this case both as to liability and as to the charge of fraud and false swearing, and the strong evidence on these points offered by the defense, I would be inclined to hold that the above prejudicial remark of the plaintiff was so serious as to require reversal. In dealing with prejudicial remarks such as the one involved here, the Court must consider the climate of the contest in which it occurred. Beck v. Wings Field, Inc., 3 Cir., 122 F.2d 114; Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557. However, the trial judge gave an appropriate instruction and was satisfied that his instruction eliminated any prejudice to the defendant from such remark. My brothers believe that the court's instruction was sufficient to overcome the prejudice. In any event, such matters are ordinarily within the discretion of the trial judge. Accordingly, it is the Court's holding that what occurred does not require the granting of a new trial.

Error is further assigned on the trial court's refusal to instruct the jury that whatever damages they determined had been suffered by plaintiffs should be reduced to twenty-five percent—this because of an apportionment clause in defendant's policy. The policy provided coverage in the total amount of $45,000. At the time of its issue, plaintiffs' home was insured under three additional policies providing fire and extended coverage. None of these additional policies had been issued by the defendant, nor had any of them been obtained from defendant's agent who sold the policy in suit to plaintiffs. None of such additional policies had an "All Physical Loss" endorsement on it. With all of these policies in effect, there was a total of $60,000 coverage, either for fire and extended coverage or "All Physical Loss," or both. Seventy-five percent of this total was provided by defendant's policy of $45,000. The apportionment clause in defendant's policy provided:

> "This company shall not be liable for a greater proportion of any loss from any peril or perils included in this form that (1) the amount of insurance under this policy bears to the whole amount of fire insurance covering the property, or which would have covered the property except for the existence of this insurance, whether collectible or not, and whether or not such other fire insurance covers against the additional peril or perils insured hereunder. * * *"

The three additional policies were in effect at the time of the loss involved here. Unless the plaintiffs' reasons (hereinafter discussed) for asserting that the apportionment clause should not be applied are sound, the defendant could not be held for more than seventy-five percent of plaintiffs' loss.

It was plaintiffs' contention that the apportionment clause should not apply because, as plaintiff William M. Hanley testified, upon receipt of his policy from the defendant on May 26, 1954, he noted there was not endorsed thereon the fact of the existence of the other three policies, as had been the case in a previous policy which he had had with Firemen's Fund Insurance Co. He said that he called this to the attention of defendant's agent, Allen, and requested the latter to see to the cancellation of these other three policies. He said that Allen agreed so to do. No such cancellation took place, and the three policies in question were in force on the date of the casualty, and were still in effect at the time of trial, as part of the coverage on plaintiffs' home at its new location. Defendant's agent testified that he did not have any recollection of agreeing to cancel the other policies. He was not an agent for any of the companies that issued them and, obviously, had no authority *from such companies* to effectuate cancellation of their policies.

There was no evidence that the agent Allen had any express authority from the defendant to undertake the cancellation of such other policies for the plaintiff. The

plaintiff Hanley testified, in relation to this subject,

> "* * * he (Allen) promised to see that they were cancelled and to follow it through. And, naturally, I didn't know further about it, figuring he was acting as my agent in the matter."

The Court told the jury that if they found that plaintiff Hanley had instructed defendant's agent to cancel the three fire insurance policies, or if the agent undertook and promised to do so, and that the plaintiffs relied to their detriment upon such undertaking and promise, either by failing to cancel the policies or by taking a larger amount of insurance from the defendant insurance company than would otherwise have taken if they had elected to procure appropriate endorsements on the other three policies, then the defense under the apportionment clause would not be available to the defendant.

Plaintiffs' position is that Allen's undertaking to cancel the additional policies was within his implied or apparent authority as agent for the defendant, and that his failure to carry out that undertaking estopped defendant from relying upon the apportionment clause of its policy. There was no evidence that defendant company, by action or inaction, could have led the plaintiffs to believe that its agent had authority on its behalf to undertake the cancellations in question. We do not think that the defendant exhibited to these plaintiffs the appearance of such authority by the mere fact of making Allen its general agent for selling its insurance policies. Obviously, none of these other companies would cancel its own contract of insurance without some direction from its own policyholder. Plaintiffs, themselves, did not claim that they relied on the defendant company to cancel the mentioned policies. As stated above, William M. Hanley considered Allen as his agent for the purpose in question. When asked why he didn't, himself, call the agent who had written the policies, he stated, "I realize, definitely, that I was very lax about it." We do not believe that there was any evidence from which a jury could find that Agent Allen had any authority, express, implied or apparent, to bind the defendant in this regard. In Comment (a), § 27 of Restatement of Law, Second, Agency, page 104, it is said:

> "For apparent authority there is the basic requirement that the principal be responsible for the information which comes to the mind of the third person. * * * Thus, either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief."

Such is the law in Michigan. Serbinoff v. Wolverine Mutual Motor Ins. Co., 242 Mich. 394, 218 N.W. 776; Gambino v. Northern Insurance Co., 232 Mich. 561, 205 N.W. 480; Martin v. John Hancock Mutual Life Ins. Co., 277 Mich. 249, 269 N.W. 162; Marx v. King, 162 Mich. 258, 127 N.W. 341; and Mitchell v. Western Fire Ins. Co., 272 Mich. 204, 261 N.W. 300.

Plaintiffs claim that, aside from apparent or implied authority, defendant should be estopped from relying upon the apportionment clause. They cite the case of Bergeron v. Mansour, 1 Cir., 152 F.2d 27, in support of this petition. The decision in that case, however, assumed that an insurance adjuster had the apparent authority to do the things which created the estoppel. In that case, the First Circuit said, at page 31:

> "It is clear that all insurance adjusters have at least apparent authority to make promises of settlement."

Such is not this case.

It is claimed further by plaintiffs that Allen's alleged promise should be binding upon defendant because, plaintiffs say, it was given as part of the inducement to plaintiffs' purchase of the policy. This

is unsound. The record shows that any promise by Agent Allen was made after the policy was issued and delivered to plaintiffs.

Lastly, on this point of the apportionment clause, plaintiffs say that defendant cannot raise it because defendant's counsel did not, in compliance with Rule 51, 28 U.S.C., make adequate or sufficiently clear objection and exception to the Court's failure to give defendant's request No. 47. By such request, the jury would have been instructed to reduce whatever damages they found plaintiffs had suffered by one-fourth. Before starting his charge, the trial judge indicated that he would not give defendant's request No. 47. After the charge, defendant's counsel objected to the instruction that defendant would be bound by a promise by the agent, Allen, to cancel the other policies. Counsel asserted that if Allen made the promise, he was acting as agent for plaintiffs. The Court, at that point, said, "All right, the record will show your exception." In the discussion following the charge, defense counsel asked to make record of his exceptions to the refusal of any instructions he had proffered. The following then took place:

> "The Court: * * * Under the rules, you will take exception to those instructions which are not given which you feel should be given or which are not covered.
>
> "Mr. Levin: Instruction 14 was refused by the Court.
>
> "The Court: That is right.
>
> "Mr. Levin: I take exception to that.
>
> "The Court: You can just state the numbers.
>
> "Mr. Levin: Yes. 17, Your Honor, was not given. 37 was not given * * * and, as I recall, 47 was not given. And to the refusal to instruct the jury in accordance therewith, on each of them I will take exception.
>
> "The Court: All right, the record will show your exception."

We think that the foregoing was sufficient to save for review the Court's refusal to give defendant's request No. 47. We are of the opinion that the apportionment clause of the policy was effective to limit plaintiffs' recovery to seventy-five percent of whatever damages the jury determined were suffered by the plaintiffs. It was error for the Court not to have so instructed the jury.

The total amount claimed by plaintiffs at the close of all of the proofs was $28,355.03, and the Court charged the jury that that was the total amount that could be awarded to the plaintiffs. The jury's verdict was $25,589.70. It is obvious that the jury made no reduction of the damages found by applying the apportionment clause. The Court in its instructions merely told the jury that the defense of the apportionment clause could not avail the defendant if the jury found under the facts that the plaintiff Hanley had instructed defendant's agent to cancel the additional insurance policies.

The amount of the verdict represented the jury's finding of plaintiffs' total damages. Under our holding, such damages should be reduced by twenty-five percent. Rather than send this cause back for a new trial, we think it is better practice to reduce the verdict by twenty-five percent and give judgment for plaintiffs in the reduced amount of $19,192.28. Such disposition of the matter comports with proper procedure under Section 2106, Title 28 U.S.C., Garrett v. Faust, 3 Cir., 183 F.2d 625; Niagara Fire Ins. Co. v. Bryan & Hewgley, 6 Cir., 195 F.2d 154; Scottish Union & National Ins. Co. v. Bejcy et al., 6 Cir., 201 F.2d 163, 37 A.L.R.2d 534.

Other errors have been assigned by the defendant. We are satisfied, however, that the ruling of the trial court on these matters was correct, and where discretion controlled, the Court did not abuse its discretion. The within cause is remanded to the District Court to reduce the judgment for plaintiff to the amount of $19,192.28.

As defendant-appellant has denied all liability under the policy, it is not the prevailing party on this appeal, and plaintiffs are entitled to recover their costs.