## EUGENE S. THOMPSON *vs.* THE NEW HAVEN WATER COMPANY.

\* First Judicial District, Hartford, January Term, 1913.
\*\* HALL, C. J., PRENTICE, THAYER, RORABACK and WHEELER, Js.

Flood or freshet water may present at times the unmistakable indicia of a watercourse, at other times the characteristics of surface water, and on still other occasions may have the distinguishing marks of neither. Accordingly, it is the wiser and safer course to treat such water as constituting a class by itself, to which legal principles appropriate to the varying conditions may be applied, rather than to force it into one or the other of the two classes first mentioned, where its treatment as one of that class must necessarily give rise to perplexity, and lead, as it already has done, to involved and contradictory decisions.

However it may be defined, "surface water" in this State does not embrace flood water escaped from channels in large volume and flowing in masses to join some larger and more permanent body.

---

\* Transferred from third judicial district.

\*\* Hall, C. J., having died the day after the cause was argued, Beach, J., took the briefs and participated in the decision.

An owner of low-lying meadow land which has for years been fertilized and enriched by freshet overflows from above, is entitled to have the natural flood-flow continued to his land, as against an upper riparian owner whose interference with such flow has no justification in the use, improvement, or protection of his own land. Under such circumstances the damage inflicted cannot, with due consideration for property rights, be regarded as *absque injuria*.

The only obstruction to the flow in the present case was an embankment caused by earth thrown up from an underground conduit built by the defendant through land which it had bought of the plaintiff. *Held* that inasmuch as the plaintiff's knowledge of the defendant's purpose in acquiring the land and the use to which it was to be put, furnished no reason for him to anticipate the erection of the embankment, he was not estopped thereby from claiming compensation for his damage; and that an express reservation of an easement of accustomed flow was not necessary to preserve to the plaintiff, as adjoining proprietor, the rights incident to his ownership of the land he retained.

The plaintiff alleged that the embankment was built in January, 1911, though it appeared in evidence that it was thrown up late in 1907 and early in 1908, and the defendant contended that no recovery could be had for damages prior to the alleged date. *Held* that while the date alleged might have been misleading it was not material; and that although the complaint was by no means an ideal one for a recovery extending back to 1908, its fault in this respect was uncertainty rather than legal insufficiency.

A claim which finds no reasonable support in the evidence should be withdrawn from the jury's consideration; though the evidence may be of such a character, as in the present case, that no harm could have resulted from the court's failure to give such a direction.

Argued January 14th—decided April 17th, 1913.

ACTION to restrain the defendant from maintaining a dam and embankment and from further diverting the freshet water of Farm River, so-called, from the plaintiff's premises in East Haven, whereby his lowlands were fertilized, and also for damages, brought to the Superior Court in New Haven County and tried to the jury before *Gager, J.;* verdict and judgment for the plaintiff for $250 damages, together with a decree for an injunction, and appeal by the defendant. *No error.*

The parties offered evidence to prove the following

facts, which, in so far at least as they are material to any question of law presented, were uncontradicted:—

Prior to 1896 the plaintiff was the owner of a considerable tract of land in East Haven, used by him for farming purposes. The eastern portion of its northern boundary was Farm River, so-called, which flowed from east to west. The western portion of this boundary was back a short distance from the river, another ownership intervening. Back from the river some six hundred to twelve hundred feet was a line of hills and high ground. This line of high land was farther from the river on the east than on the west side of the tract by reason of the gradual approach of high land and river to each other. The space between the two was lowland meadow suited to the growth of hay.

In 1896 the defendant began condemnation proceedings to acquire a strip of land one hundred feet wide extending across this meadow from the river to the hills. It was alleged that this strip was desired for increasing the capacity of Lake Saltonstall as one of the defendant's reservoirs, and the building of conduits and canals for the conveyance of water from Farm River to said lake. Pending these proceedings the plaintiff conveyed to the defendant by warranty deed, without other reservation than a right of way, said strip, which was described as being about fourteen hundred feet long and extending fifty feet in width on each side of the middle line of a proposed tunnel and canal to connect Farm River with Lake Saltonstall. The location of this middle line was defined. In 1901 the plaintiff conveyed to the defendant all the land which he owned easterly of the line of the proposed canal and tunnel, and other land lying westerly of the canal. This deed was also a warranty without reservation other than a right of way. As the result of these deeds the defendant acquired all of the plaintiff's land whose

boundary touched the river, and the tract which the plaintiff retained lay farther to the westward, and down stream, and at no point reached the river. In the tract thus retained by the plaintiff were about sixteen acres of the lowland. At the east this tract extended back from the river about nine hundred feet, and at the west about six hundred feet. It was about one thousand feet in length, measuring east and west.

The southerly river bank from a point some three hundred feet easterly of the plaintiff's present land down stream was about four feet higher than ordinary water, and freshets did not overflow it. Above the point referred to it was only about two feet high for some distance. As a result the river during ordinary freshets was accustomed to overflow at this place. Upon such occasions the water spread out over the expanse of meadow between the river and high land, and flowed down over nearly its entire width in volume sufficient to make a deposit thereon, which was valuable as a fertilizer, until it again found the river a short distance after it had passed over the plaintiff's land. These freshets occurred in winter and spring only; never in summer; and some years there were none at all. Their frequency, when they did occur, varied from season to season. There was no freshet in 1911.

In 1907 and the early part of 1908 the defendant built an underground conduit from a point about one hundred feet away from the river across the lowland in the line of the one hundred foot strip, constructed a tunnel under the adjacent hills, connected the conduit therewith, and made connection between the tunnel and Lake Saltonstall. Connection between the conduit and river was not made during the period with which the questions arising in this case are concerned. In the construction of the conduit the earth was thrown up on the westerly or down stream side, and there left,

forming a ridge of earth in the nature of a continuous embankment, substantially level, and approximating four feet in height. With the lapse of time this embankment became eaten away in spots and thus presented an unequal obstruction, and occasioned irregular and accelerated flows.

By reason of this embankment the freshet waters of the years 1908, 1909, and 1910 which overflowed the south bank of the river did not flow down to and flood the plaintiff's land as and in the same beneficial manner it had formerly done.

The plaintiff claimed as elements of his damage (1) the reduced value of his hay crops due to the decreased fertilization; (2) the running dry in 1910 of his well situated upon the high land; and (3) the loss of his ability to water his cattle at the river on the highway bounding his land on the west. The court withdrew from the consideration of the jury this third element of damage, and submitted to it the other two.

Other facts found, having no relevancy to the questions discussed, need not be recited.

*George D. Watrous* and *Harrison T. Sheldon,* for the appellant (defendant).

*William B. Stoddard* and *Grove J. Tuttle,* for the appellee (plaintiff).

PRENTICE, C. J. The defendant asked that a verdict be directed in its favor, urging that all the damage which the plaintiff had shown was *damnum absque injuria.* The court instructed the jury that upon the evidence, substantially undisputed, disclosing the acts and conduct of the defendant from which this damage had resulted, it was legally liable to compensate the plaintiff therefor, and that the only question for it to determine was the amount of that compensation.

The plaintiff, as a lower landed proprietor, charges that the defendant, as an adjoining proprietor, invaded his rights by a construction upon its land which, to his damage as a lower proprietor, diverted or interfered with the natural flow of the flood water of a watercourse which, under freshet conditions, was accustomed to flow in a broad expanse over his lowland meadow to its great enrichment. The plaintiff contends that he was entitled to the natural flow of this overflowing water as being that of a watercourse. The defendant contends that it could, without legal responsibility to a 'lower proprietor, do upon its land what it pleased in the matter of appropriating, or diminishing the flow or changing the course of the flow of this water as being surface water.

We have in two or three former cases had occasion to note the characteristics of watercourses, and in each instance the same tests have been applied. *Gillett* v. *Johnson,* 30 Conn. 180, 183; *Chamberlain* v. *Hemingway,* 63 Conn. 1, 5, 27 Atl. 239; *Torrington* v. *Messenger,* 74 Conn. 321, 325, 50 Atl. 873. In the second of these cases careful attention was given to their definition and to the statement of their distinguishing characteristics. "A water-course," it was said, "consists of bed, banks and water. Yet the water need not flow continually; there are many water-courses which are sometimes dry. To maintain the right to a water-course it must be made to appear that the water usually flows in a certain direction, and by a regular channel, with banks and sides." And again it was said: "A watercourse is a stream of water usually flowing in a definite channel, having a bed and sides or banks, and usually discharging itself into some other stream or body of water." p. 5. It is not, however, essential to the existence of a watercourse that at all points in its course the bed or channel show a worn surface, or even broken

turf, or that the banks or sides form prominent land-marks. *Gillett* v. *Johnson*, 30 Conn. 180, 183.

These definitions necessarily imply what is more directly stated in others, that it is a distinguishing mark of a watercourse that there be "a supply which is permanent in the sense that similar conditions will always produce a flow of water, and that the conditions recur with some degree of regularity, so that they establish and maintain for considerable periods of time a running stream." 2 Farnham on Waters & Water Rights, § 457.

"Surface water" is a term which has been defined or used variously. A few of the definitions embody statements which would imply that it is a term appropriate to be applied to all fresh water upon the surface of the earth, not ponded, which is not that of a watercourse. Other authorities, while giving a definition which affords no logical foundation for such a broad use of the term, act upon the assumption that all non-ponded fresh water is either surface or stream water. The better and more generally stated definitions, and those which permit a consistent application productive of just results, confine surface water within more definite limits. For instance, the Amer. & Eng. Ency. of Law (Vol. 30, p. 323) says: "Surface water may be defined as waters on the surface of the ground which are of a casual or vagrant character, following no definite course and having no substantial or permanent existence, and which are lost by being diffused over the surface of the ground, through percolation into the soil or evaporation." Farnham treats it as water appearing upon the surface of the ground in a diffused state, with no permanent source of supply or regular course, and then disappearing by percolation or evaporation. Vol. 3, § 878. Water is surface water while it is oozing through the soil, or diffusing and squandering itself

over the surface, following no defined course. *Schaefer* v. *Marthaler,* 34 Minn. 487, 26 N. W. 726. These definitions are doubtless open to criticism, as where the means of disappearance are limited to percolation and evap-. oration, and natural drainage into watercourses is ignored. But they serve to indicate that water moving in volume, whose source is a stream, is excluded, and that conditions presenting the general appearance upon the surface of the earth of those created by rain or snow fall are those intended to be embraced. There are cases which appear to limit the term to water which had its immediate source in rains or melting snow. *Crawford* v. *Rambo,* 44 Ohio St. 279, 282, 7 N. E. 429. Others have properly included, as possible sources of surface water, springs upon or underneath the ground. *Grand Junction Canal Co.* v. *Shugar,* L. R. 6 Ch. App. 483, 486; *Gray* v. *McWilliams,* 98 Cal. 157, 32 Pac. 976.

A considerable number of our cases have dealt with surface water. In no one of them, however, was an attempt made, and perhaps wisely, to formulate a comprehensive definition. But in all of them the source was rain or snow fall or springs. In nearly every one the condition was one which grew out of the natural drainage of fallen moisture. As to the form which the water assumed upon the surface of the ground, it was not in any case water collected or flowing in mass, but always water scattered and diffused over the earth as conditions of the weather and the conformation and character of the ground dictated, and standing still or moving aimlessly along until it should become dissipated by percolation or evaporation, or lost in the current of a stream. *Adams* v. *Walker,* 34 Conn. 466; *Grant* v. *Allen,* 41 Conn. 156; *Chadeayne* v. *Robinson,* 55 Conn. 345, 11 Atl. 592; *Smith* v. *King,* 61 Conn. 511, 23 Atl. 923; *Byrne* v. *Farmington,* 64 Conn. 367, 374, 30 Atl. 138; *Stein* v. *Coleman,* 73 Conn. 524, 48 Atl. 206;

*Goldman* v. *New York, N. H. & H. R. Co.*, 83 Conn. 59, 75 Atl. 148. A study of these cases is convincing that the accepted conception of surface water in this jurisdiction is one which is not sufficiently comprehensive to embrace flood water escaped from channels in large volume and flowing in masses to its destination in some larger and more permanent body.

Looking at the various phases which the freshet overflow of streams may assume, it is apparent that it may present the unmistakable indicia of either a watercourse or of surface water. The water which has overleaped the banks confining the normal flow of the stream may still go on its way in a well defined channel. Its line of movement may present all of the recognized indications of a watercourse. The bed, banks, and flow may be there, so that the water clearly deserves to be regarded as either a part of the stream from whose main course it was turned aside, or, at least, an independent stream. On the other hand, the escaped water may have become so scattered and diffused over the adjoining territory and there taken on such a character as to present all the recognized characteristics of surface water. It is equally evident that this overflow may appear under such conditions that the requisites of a watercourse according to our definition are not present, and at the same time the characteristics of surface water according to our accepted notions are not discoverable.

We are thus presented with the important practical question as to whether we shall change our definitions so that the limits of the fields of the two classes shall be brought together, and the two be made comprehensive enough to include all nonponded fresh water, or shall recognize a third class between the two, to be dealt with independently and with a sole regard for the conditions it may present. In substantially all, if not all, jurisdictions where there has been occasion to deal with con-

ditions arising from flood water, the courts have felt under the necessity of finding a place for it in one or the other of the two classes referred to, by some sort of expedient and at whatever cost of inconsistency. The result has been a most perplexing medley of decisions, which refuse to yield a satisfactory working rule. In some cases flood water has been made to masquerade as surface water; in more as a watercourse. The great struggle has been to so classify it that justice to the rights of parties under the given conditions might be done. When the classification has once been thus established, the difficulty has arisen that it fails, under another set of conditions, to lead to results consonant with justice, if accepted principles applicable to the class where the new conditions find themselves placed are observed. Then has come the necessity for legal gymnastics, if palpably right results were to be attained. A good illustration is furnished by certain English cases. They have held that there was no good basis for distinction between the ordinary water of a stream and flood water. *Menzies* v. *Breadalbane*, 3 Bligh N. S. 414; *Rex* v. *Trafford*, 1 Barn. & Adol. 874. And yet in the latter case, on appeal, the court did not hesitate to say that a landowner might raise the banks of a stream so that its waters might not escape as it had been accustomed to do. *Trafford* v. *Rex*, 8 Bing. 204.

Farnham, in his work, § 878 *et seq.*, presents very fully the unsatisfactory and involved condition of the law which has resulted from a failure on the part of the courts to treat flood water not bearing the indicia of either surface water or a watercourse, as a thing deserving independent classification, and the application to it of legal principles appropriate to the situations it may present, and not forced upon it by an association in a class with other things with which it may not be at all points allied. The note in 25 L. R. A. 527, 530,

emphasizes the awkwardness of the prevailing legal situation upon this subject, and both the annotator and Farnham unite in the suggestion that the only safe course is to treat flood water as forming a class by itself. 3 Farnham on Waters & Water Rights, § 879.

The wisdom of this suggestion appears to us to be manifest. Fortunately we not only are in a position to adopt it without running counter to former decisions, but also could not choose the only alternative course without revising established definitions and accepted conceptions. This latter we deem it unwise to undertake.

The questions which have arisen, where flood water conditions were involved, have usually grown out of the raising of the bank of the stream to prevent overflow, or the obstruction or diversion of the flood-flow whereby it was cast back or thrown over upon the land of another proprietor in accumulated or accelerated volume to his damage. The rights of parties in such cases are not hard to find, and would not be difficult of definition as applied to flood water alone. We have here, however, a very different question. It involves the right of a lower proprietor to have the natural flood-flow continued to his land for the benefit which will be derived from it. This general subject is one which might be presented in various aspects. We have no occasion to attempt to anticipate all of them, and formulate a rule applicable thereto. The case presents a comparatively simple situation, and we may well confine our attention to that.

The evidence discloses that the defendant, the upper proprietor, has not attempted to appropriate the flood water reaching its land in the improvement or enjoyment of such land, or to interfere with or affect the flow of the water for any purpose connected with that land. The embankment, in so far as appears, or can be

imagined, neither serves, nor was intended to serve, any useful purpose. The conduit, as it was when the damage for which recovery was permitted, was equally useless for any present purpose, except as it may have carried surface or flood water into the defendant's reservoir some distance away, and there made it available for sale. Whatever prospective purpose it had was in connection with the defendant's business carried on elsewhere, and the embankment was created as an incident of the conduit's construction. We thus have a situation in which the plaintiff was damaged in his property by an act of the defendant in interfering with the natural flow of the flood water, which had no justification in the improvement, use, enjoyment, or protection of its land. Damage done under such circumstance cannot, with due regard for property rights, be regarded as *absque injuria*.

The defendant complains of the action of the court in submitting to the consideration of the jury the extent of the damage done to the plaintiff's well, and in permitting a recovery therefor. The evidence upon this subject discloses no reasonable foundation for a finding of damage of that character suffered, and the plaintiff's claim in that regard should have been withdrawn from the jury's consideration. The evidence, however, was of such a character that it is impossible to conceive that harm was done by the course pursued.

The defendant also complains of the refusal of the court to charge, as requested, that the plaintiff was estopped from asserting his present claim for compensation by reason of his deed in 1896, without reservation except of a right of way, of the one hundred foot strip in which the conduit lies, the circumstances under which that deed was given, the later conveyance of adjoining land, also without reservation, and the knowledge the plaintiff had of the defendant's purpose in

acquiring the land and of its intended use. The condemnation proceedings were begun for the expressed purpose of building, across the strip sought to be acquired, one or more conduits or canals for the conveyance of water, and the land was described in the condemnation proceedings and deed as extending fifty feet on each side of a proposed tunnel and canal to connect Farm River with Lake Saltonstall. This, as far as appears, was the extent of the plaintiff's knowledge of the intended use. He had no reason to anticipate the erection of the embankment, which was the real cause of the conditions complained of. He was justified in anticipating that a connection would be made with the river. It is obvious that neither the present covered conduit without the embankment, nor an open canal connected with the river, would have produced the results of which the plaintiff complains. In either case the flood water would have swept over the defendant's land on its way to the plaintiff's, in substantially undiminished quantity and unchanged conditions. An express reservation of an easement of accustomed flow was not necessary to preserve to the plaintiff, as adjoining proprietor, the rights incident to his ownership of the land he retained and appurtenant thereto.

The defendant's remaining contention is that the court erred in permitting recovery upon the complaint for the years 1908, 1909, and 1911, for which period alone recovery was allowed. The complaint is by no means an ideal one, as directed to a recovery extending back to the year 1908, when the conduit and embankment were constructed. Its fault in this respect, however, is uncertainty rather than insufficiency. The date alleged might be misleading, but it was an immaterial averment and the defendant was not justified in taking it literally. The story of the defendant's claimed wrongful acts is so told, and the order of events so

given, as to leave some uncertainty as to what was intended to be comprehended. But the defendant's acts, during the years antedating 1911, were all recited, the consequences, which followed in those years only, were set out, and the defendant apparently had, and availed itself of, a full opportunity to meet the claim which the court submitted to the jury. We can discover no prejudice to the defendant's rights by the course pursued; neither do we think it without warrant in the allegations made.

There is no error.

In this opinion the other judges concurred.