FENMODE, INC., v. AETNA CASUALTY & SURETY CO.

1. WATERS AND WATERCOURSES—SURFACE WATERS—DEFINITION.
   Surface waters are commonly understood to be waters on the surface of the ground, usually created by rain or snow, which are of a casual or vagrant character, following no definite course and having no substantial or permanent existence and which are lost by percolation, evaporation, or by reaching some definite watercourse or substantial body of water in which they are accustomed to, and do, flow with other waters.

2. INSURANCE—WATER DAMAGE POLICY—EXCEPTIONS—FINDING OF
COURT.

Finding of trial judge, sitting without a jury, that waters which
entered basement of store leased by plaintiff had accumulated
outside of the premises and entered thereupon and were within
exception of "water damage" insurance policy relieving in-
surer from liability where loss was caused directly or in-
directly by "floods, inundation, backing up of sewers or
drains, or the influx of tide, rising or surface waters," *held*,
supported by sufficient testimony.

Appeal from Wayne; Moynihan (Joseph A.), J.
Submitted October 7, 1942. (Docket No. 21, Calen-
dar No. 42,020.) Decided November 24, 1942.

Assumpsit by Fenmode, Inc., against Aetna Cas-
ualty & Surety Company, a Connecticut corporation,
on an insurance policy. Judgment for defendant.
Plaintiff appeals. Affirmed.

*Morris Lieberman* (*George Stone*, of counsel), for
plaintiff.

*Gerald E. Schroeder,* for defendant.

BUSHNELL, J. Plaintiff, Fenmode, Inc., is the
owner and operator of a ladies' ready-to-wear store
at 6506 Woodward Avenue, Detroit, and defendant,
Aetna Casualty & Surety Company, is its insurer on
a "water damage" policy. This action arose be-
cause of damage to plaintiff's stock of merchandise
in its basement by reason of a heavy rainstorm dur-
ing the night of June 12, 1941.

The policy provides coverage "against all DI-
RECT LOSS AND DAMAGE caused solely by the
accidental discharge, leakage or overflow of
WATER or STEAM from within the following
source or sources: PLUMBING SYSTEMS (not in-
cluding any Sprinkler System), PLUMBING
TANKS (for the storage of water for the supply

of the plumbing system), HEATING SYSTEM, EL-
EVATOR TANKS and CYLINDERS, STAND
PIPES for FIRE HOSE, INDUSTRIAL or DO-
MESTIC APPLIANCES, REFRIGERATING
SYSTEMS, AIR CONDITIONING SYSTEMS,
and RAIN or SNOW ADMITTED DIRECTLY to
the INTERIOR of the BUILDING through DE-
FECTIVE ROOFS, LEADERS or SPOUTING, or
by OPEN or DEFECTIVE DOORS, WINDOWS,
SHOW WINDOWS, SKYLIGHTS, TRANSOMS
or VENTILATORS, except as herein provided."

Among the "hazards not covered" is loss or dam-
age caused directly or indirectly by "floods, inun-
dation, backing up of sewers or drains, or the influx
of tide, rising or surface waters."

The decision in this case is controlled by a deter-
mination of the source of the water in the basement
and whether that source is within the coverage of
the policy or the exception thereto.

Plaintiff claims the damage was caused by water
which entered the premises directly from a defective
spout through an air duct, through a partly open
window and through a defective back door. Defend-
ant claims this damage was caused by surface wa-
ters which flowed under the defective door.

About a week previous to the rainstorm of June
12th, plaintiff's president and general manager,
Joseph H. Sake, noticed that a downspout at the
rear of the store was broken and notified plaintiff's
landlord to come and repair it, but this was not
done. After Sake first had noticed the broken con-
dition of the downspout there was a heavy rain-
storm on June 7th, and he at that time had put
pieces of carpet padding against the back door to
prevent water from getting into the main part of
the store.

When Sake arrived at the store on the morning after the storm of June 12th, he found the spout torn off and hanging on a hook, that a steel fenestra window under this spout was not tightly closed, that there was dampness in the rear of the store near the back door, and that there was two feet of water in the basement. When the air conditioning unit, which has an air intake in the fenestra window, failed to operate, inspection showed its machinery rusty and wet. Sake also testified that the lot in the rear of the store, which was covered with cinders, was wet and had standing puddles of water on it.

Defendant on cross-examination introduced in evidence a statement signed by Sake the day after the storm, in which he said:

"We had a heavy rainstorm today. It had been raining several hours when I opened up this morning. I noticed that the carpeting in the back of the store was soaked for several feet in. There was water all over the flooring in the back near the door and on the steps leading down to the basement. In back of the store, the cement driveway was a pool, the water extending into a parking lot back of the store, north to the end of the building block and south about 20 feet. There are four stores in all in the block and three of them were flooded—Fintex, Thom McAn's and ours.   *   *   *

"The damage was caused by the defective drain pipe. So much water apparently came down from the roof and instead of being carried away through the pipe, ran down into the driveway, the accumulation being too much for the sewer to carry away. It then came into the store through the back door, and ran down the stairs and also entered the basement from a hole in the floor where there is a Western Union lead-in wire."

This signed statement was the only evidence offered by defendant.

The cause was heard by a trial judge sitting without a jury, who found that the damage was caused by accumulated waters entering the premises and held there should be no recovery under the policy, because damage caused by such waters was specifically excepted from the coverage of the policy. A judgment of no cause of action was entered, from which plaintiff has appealed.

An examination of the various definitions of surface waters collected in *Thompson* v. *New Haven Water Co.*, 86 Conn. 597 (86 Atl. 585, 45 L. R. A. [N. S.] 457), shows that surface waters are commonly understood to be waters on the surface of the ground, usually created by rain or snow, which are of a casual or vagrant character, following no definite course and having no substantial or permanent existence. Such waters are lost by percolation, evaporation or by reaching some definite watercourse or substantial body of water in which they are accustomed to, and do, flow with other waters.

The term "accumulated waters" as applied to the facts by the trial judge falls within this definition. See *Brandenberg* v. *Zeigler,* 62 S. C. 18 (39 S. E. 790, 55 L. R. A. 414, 89 Am. St. Rep. 887); *Bringhurst* v. *O'Donnell,* 14 Del. Ch. 225 (124 Atl. 795). See, also, *Shea* v. *Gavitt,* 89 Conn. 359 (94 Atl. 360, L. R. A. 1916 A, 689), which deals with the right of the owner of a dominant estate to discharge surface waters onto a servient estate by artificial means. Such facts are distinguishable from those in the instant case.

Both parties rely on *Goldfarb* v. *Maryland Casualty Co.*, 311 Ill. App. 568 (37 N. E. [2d] 376). That case involved somewhat similar facts and a water damage policy containing language almost identical

with that in the instant case. Decision there turned primarily on the determination of the facts by the trial judge sitting without a jury, who found that the damage was caused by rain which entered the premises "directly" through a defective door. There was "no evidence that there was any water lying on the ground, in the areaway back of the defective door."

There is sufficient testimony in the instant record to support the conclusion reached by the trial judge that the damage was caused by surface waters.

The judgment is affirmed, with costs to appellee.

CHANDLER, C. J., and BOYLES, NORTH, STARR, WIEST, BUTZEL, and SHARPE, JJ., concurred.