CHARLES F. DIMMOCK ET AL. *v.* CITY OF NEW LONDON

KING, C. J., ALCORN, HOUSE, THIM and RYAN, Js.

Argued June 7—decided July 9, 1968

*Richard F. Corkey,* for the appellants (plaintiffs).

*Edmund J. Eshenfelder,* for the appellee (defendant).

HOUSE, J. The plaintiffs, who are riparian owners along the course of Harris Brook and one of its source streams known as Fraser Brook, in Salem, instituted this action to enjoin the defendant from diverting water from a branch of Fraser Brook and to recover damages for the diversion already made.

The finding, with the addition of such admitted and undisputed facts as the plaintiffs are entitled to have included, establishes the following facts material to the issues on this appeal: The defendant, the city of New London, owns a large tract of land east of route 85 and south of Forsythe Road in Salem. On this land there is a reservoir known as Fairy Lake, which is a part of the defendant's water system. North of Fairy Lake and also on the defendant's land is Bond Pond, which was created in 1916 or 1918 by a previous owner, who built a concrete dam across the course of a branch of Fraser Brook and thus impounded the waters of that brook to create the pond. Although they are not far apart, Fairy Lake and Bond Pond lie in separate and distinct watersheds. The natural flow of water out of Fairy Lake is to the south. The flow of the branch of Fraser Brook dammed to create Bond Pond is in a general westerly direction into a branch of Harris Brook, this flow being across the lands of the plaintiffs.

As the result of a severe six-year drought, the supply of water in the defendant's reservoirs had been seriously depleted, and as of December 29, 1965, water in storage in the defendant's reservoirs was but 18.8 percent of capacity. Restrictions on the use of water by consumers on the defendant's water supply system were imposed, and the defendant made a lease arrangement to take water for its system from a pond known as Beckwith Pond, com-

mencing pumping operations to obtain water from this source in February, 1966. In February or March, 1966, the defendant also caused a canal to be excavated between Bond Pond and Fairy Lake. The canal is 400 feet in length with a width at its base of six feet. For approximately 200 feet on the center line of the canal, the excavation was made through ledge, the maximum cut of the ledge being approximately ten feet on the center line. The canal slopes on a 1 percent grade from Bond Pond to Fairy Lake. On March 18, 1966, the defendant installed stop logs to a height of 2.3 feet on the dam which had created Bond Pond, the stop logs being about the same height as the invert of the canal, and they were maintained at this height from that date to the time of trial on October 11, 1966. As a result, slightly more than half the water from Bond Pond goes over the dam and in its natural course continues in streams over the plaintiffs' lands, and slightly less than half is diverted from that natural watershed and instead flows south through the canal to Fairy Lake and into the defendant's water system. Readings taken a week after the defendant installed the stop logs at Bond Pond showed that, of a total flow in the brook course of 994,500 gallons per day, 439,000 gallons were diverted by the defendant through its canal. Readings taken on nine days between April 4 and June 2, 1966, showed 185,000 gallons per day flowing over the dam into the lower part of the brook course and 155,000 gallons per day being diverted into the defendant's canal. During the summer of 1966, there was little or no flow in any of the brooks of the area, and as of August 31, 1966, precipitation for the calendar year to that date was 30.65 percent below normal.

Between June 23, 1966, and October 6, 1966, there

was no flow of water out of Bond Pond into either the canal or the brook. As a result of its 2,000,000 gallons per day temporary pumping operation at Beckwith Pond and to a very small extent as a result of its springtime diversion from Bond Pond, the defendant was able to increase its water supply in storage from 18.8 percent of reservoir capacity on December 29, 1965, to 52.6 percent of capacity on August 31, 1966. In the late spring or early summer of 1966, it removed the restrictions which it had imposed on the use of water by its customers, and between January 1, 1966, and the date of trial on October 11, 1966, it approved the sale of water to sixty additional residential properties in Waterford and the sale of 50,000 gallons per day to an atomic power site.

On the foregoing facts, the trial court concluded that the defendant's use of the water from Bond Pond was a public use; that the measures taken by the city were not unreasonable; that its action was necessary and appropriate to protect the communities served by the water supply of the defendant's reservoirs and ponds; that to grant an injunction would adversely affect the interest of the public; and that no damages were proven by the plaintiffs. It rendered judgment for the defendant, and it is from that judgment that the plaintiffs have appealed.

So far as actual damage sustained by the plaintiffs is concerned, the conclusion of the trial court cannot be successfully attacked. Each of the plaintiffs testified to the manner in which his property was adversely affected by the defendant's diversion of water from Bond Pond. The weight and degree of credibility to be given to this testimony, however, was for the trial court to determine. *Fruchtman* v.

*Manning,* 156 Conn. 500, 505, 242 A.2d 723; *Brockett* v. *Jensen,* 154 Conn. 328, 330, 225 A.2d 190. Despite their testimony, the court, as the trier of fact, could find that the plaintiffs failed to sustain their burden of proof as to any actual damage to their property or, under the circumstances, that any actual damage they did sustain as a result of lack of water in the stream crossing their properties was due, not to any diversion of water by the defendant, but rather to the severe drought which dried up all the streams in the area. The lack of such proof, however, is not decisive where, as in this case, the gravamen of the plaintiffs' complaint is the defendant's infringement of their riparian rights. The facts found by the trial court clearly establish that the defendant did divert and appropriate to its own use a portion of the natural flow of a branch of Fraser Brook which would otherwise, in its natural course, have flowed through the properties of the plaintiffs.

A riparian owner is entitled to the natural flow of the water of the running stream through or along his land, in its accustomed channel, undiminished in quantity and unimpaired in quality. *Collens* v. *New Canaan Water Co.,* 155 Conn. 477, 486, 234 A.2d 825; *Adams* v. *Greenwich Water Co.,* 138 Conn. 205, 217, 83 A.2d 177; *Donnelly Brick Co.* v. *New Britain,* 106 Conn. 167, 173, 137 A. 745; 93 C.J.S., Waters, § 9; 56 Am. Jur., Waters, § 13. As we noted in *Stamford Extract Mfg. Co.* v. *Stamford Rolling Mills Co.,* 101 Conn. 310, 320, 125 A. 623, this is an ancient common-law right which a riparian owner can protect without reference to any beneficial use of the water actually made by him. See 3 Kent, Commentaries, p. 439. Since it is a right which may be affected by prescription, the lower riparian

owner is deemed to be injured as to such rights by any unlawful diversion on the part of an upper proprietor regardless of any actual use of the waters of the stream by the lower riparian owner.

Regardless of any perceptible, actual damage which a lower riparian plaintiff may be able to prove resulted from a wrongful diversion by an upstream defendant, such a diversion is an invasion of the rights of that plaintiff and by our law, if it is continued for the period of fifteen years, would confer a prescriptive right upon the defendant so to divert the stream. General Statutes § 47-37; see *Stamford Extract Mfg. Co.* v. *Stamford Rolling Mills Co.*, supra, 321; *S.O. & C. Co.* v. *Ansonia Water Co.*, 83 Conn. 611, 624, 78 A. 432. As this court said over one hundred years ago: "Whatever doubt may have been entertained formerly upon this subject, it is now settled, by the uniform course of decisions, both in England and in this country, that where one has a right to the use of a stream naturally flowing through his land, capable of being used for a beneficial purpose, and it is diverted therefrom by another, it is not necessary for the person having such right, in an action for such diversion, to prove, that he has actually applied the water running through his land for any beneficial purpose; or, in other words, that he sustained any specific damage by such diversion, interfering with his application of the water; but that he has a right to recover, notwithstanding he has sustained no perceptible or actual damage by such diversion. And we think, that these decisions rest on the most satisfactory reasons. They proceed upon two grounds; first, that every injury, from its very nature, legally imports damage; and, secondly, that an injury to a right is a damage to the person entitled to that

right, by jeopardizing its continuance, and leading to its very destruction. An injury, legally speaking, consists of a wrong done to a person, or in other words, a violation of his right. It is an ancient maxim, that a damage to one, without an injury in this sense, *(damnum absque injuria,)* does not lay the foundation of an action; because, if the act complained of does not violate any of his legal rights, it is obvious, that he has no cause to complain. But as an injury or violation of his right necessarily imports damage, there can be no such thing as an injury without damage. An injury is a wrong; and for the redress of every wrong there is a remedy: a wrong is a violation of one's right; and for the vindication of every right there is a remedy. Want of right and want of remedy are justly said to be reciprocal. Where therefore there has been a violation of a right, the person injured is entitled to an action. If he is entitled to an action, he is entitled at least to nominal damages, or else he would not be entitled to a recovery. Such damages are given, in order to vindicate the right which has been invaded; and such further damages are awarded as are proper to remunerate him for any specific damage which he has sustained. . . . The law implies a damage from the injury, or violation of the right of the plaintiff." *Parker* v. *Griswold,* 17 Conn. 288, 302; see also *Sisters of St. Joseph Corporation* v. *Atlas Sand, Gravel & Stone Co.,* 120 Conn. 168, 176, 180 A. 303; *Watson* v. *New Milford Water Co.,* 71 Conn. 442, 450, 42 A. 265.

The plaintiffs, accordingly, were entitled at least to an award of token or nominal damages if the defendant's diversion of the water from Bond Pond was wrongful. *Patalano* v. *Chabot,* 139 Conn. 356, 362, 94 A.2d 15.

The defendant seeks to justify the diversion on the claim that it was "entitled to impound and divert to the extent of one-half thereof surface water which fell on the watershed, one-half of which watershed area it owned." The short answer to this claim is that the court made no finding which would support it. On the contrary, the court's finding discloses that the water impounded in Bond Pond was not surface water but in fact was the water from a branch of Fraser Brook. Being water in a natural watercourse, the water, even if it formerly existed as surface water, lost its identity as such. *Sozanska* v. *Stratford,* 112 Conn. 563, 566, 153 A. 164; *Thompson* v. *New Haven Water Co.,* 86 Conn. 597, 602, 603, 86 A. 585. "[S]urface waters pass beyond the exclusive right of the owner of the soil on which they fall to appropriate them as soon as they reach a natural water course, even on his own land." 3 Farnham, Waters and Water Rights § 883; Angell, Watercourses (7th Ed.), p. 5; see Reis, Connecticut Water Law: Judicial Allocation of Water Resources, p. 167.

The defendant did not seek to invoke such powers of eminent domain as it has. See "An Act to Provide the City of New London with a Supply of Pure and Wholesome Water," approved July 5, 1871 (7 Spec. Laws 157), as amended by No. 75 of the 1901 Special Laws (13 Spec. Laws 646). The trial court was not called upon to determine the extent and applicability of these powers, and neither are we.

That the defendant's use of the diverted water was a public use and that its action in making the diversion was necessary and appropriate to protect the communities served by the water supply of the defendant's reservoirs and ponds were factors relevant to the question whether a court of equity

would enjoin any future diversion, but they did not make the completed diversion any the less wrongful as to the plaintiffs whose rights were infringed by it.

The conclusion must be that the defendant's diversion of the water from Bond Pond constituted a wrongful infringement of the riparian rights of the plaintiffs for which they are, at the least, entitled to nominal damages.

This determination brings us to the remaining issue on appeal: Did the court err in refusing to enjoin the defendant from any future diversion of the waters of a branch of Fraser Brook? The granting of relief by way of injunction lies in the sound discretion of the court. *Taylor* v. *Conti,* 149 Conn. 174, 181, 177 A.2d 670; *Adams* v. *Greenwich Water Co.,* 138 Conn. 205, 218, 83 A.2d 177; *Farrington* v. *Klauber,* 130 Conn. 170, 173, 32 A.2d 644. That discretion, however, is not an unlimited one. As we said in the *Adams* case, supra: "It is well within a court's discretion to deny an injunction against the infringement of riparian rights if to grant it would adversely affect the interest of the public." Because of the drought conditions which the court found to exist at the time of the trial of the present case, it could reasonably and logically conclude, as did the court in the *Adams* case, supra, 219, that relief to the plaintiffs by way of such an injunction as requested would at that time seriously and adversely affect the public interest. The concluding portion of the opinion in the *Adams* case is, however, also particularly pertinent (p. 219): "Except for one consideration, therefore, the denial of the plaintiffs' prayer for that injunction was correct. That consideration is this: The plaintiffs do have property rights to the accustomed flow of . . . [Fraser

Brook]. In the emergency of a drought the public interest may require the court to refuse to protect those rights by way of injunction. However, the riparian owners ought not to be deprived permanently of those rights without compensation. If the judgment of the trial court stands in its present form, there is nothing to prevent the defendant from continuing indefinitely to . . . [take] water from the . . . [brook] as the most economical way of getting [a portion of] its required supply. . . . The result would be that the plaintiffs would for many years continue to be deprived of their rights without any compensation except that which they might recover by a multiplicity of actions. It is obviously not doing equity to leave them in such a position. Under the circumstances of this case, equity demanded that the defendant be allowed a reasonable time within which to make adequate compensation to the plaintiffs for the permanent taking of their water rights if it intends to acquire them, and, if that compensation is not made within such reasonable time, the defendant should be enjoined from further diversion of the waters of the stream. *Harding* v. *Stamford Water Co.,* 41 Conn. 87, 95. Although the granting or withholding of an injunction lies in the discretion of a trial court, when the only reasonable conclusion is that a plaintiff is, in equity, entitled to an injunction in a given form, it is competent for us to order such an injunction even though the trial court has refused it. *Hammerberg* v. *Leinert,* 132 Conn. 596, 604, 46 A.2d 420. The trial court was in error in unconditionally denying the injunction against the diversion of the waters of the stream."

There is error, the judgment is set aside and the case is remanded with direction (a) to award to the

plaintiffs damages in a nominal amount for the infringement by the defendant of their riparian rights and (b) to hear the parties and fix a reasonable time for the defendant to acquire the water rights of the plaintiffs by voluntary negotiation or, if the defendant has the power of eminent domain in the circumstances and elects to exercise it, by condemnation and then to render a judgment which shall direct that, unless compensation is made within that reasonable time, the defendant shall be enjoined from further diversion of the waters from the branch of Fraser Brook as prayed.

In this opinion the other judges concurred.