STATE OF CONNECTICUT *v.* THE ABE GILES SUPERMARKET, INC., ET AL.

SUPERIOR COURT      HARTFORD COUNTY      FILE NO. 178626

Memorandum filed February 6, 1973

*Robert K. Killian,* attorney general, and *Daniel R. Schaefer,* assistant attorney general, for the plaintiff.

*Kleinman, O'Neill, Steinberg & Lapuk,* of Hartford, for the defendants.

SADEN, J. This action by the state against The Abe Giles Supermarket, Inc., of 1269 Albany Avenue, Hartford, and Abraham L. Giles, as its president, treasurer, and director, individually, was instituted on October 11, 1972, and seeks a temporary and permanent injunction against the defendants for violations—set forth in six counts on six different dates—of the Connecticut Food, Drug and Cosmetic Act contained in chapter 342 of the General Statutes.

The hearing proceeded on the state's application for a temporary injunction which would, in effect, amount to closing the premises of the defendants until such time as they complied with the act. Evidence was taken over a number of days, and the court took a view of the premises lasting about two

hours. Both sides offered considerable evidence, and it would appear unlikely that a hearing on the merits could develop much more testimony than has already been heard by the court.

I

Starting on March 29, 1972, over a period of time through November 8, 1972, state inspectors of the consumer protection department inspected the defendants' premises on at least eight different occasions, making an extensive inspection in each instance. A report was filed after each inspection, a copy of which was provided the defendants, its receipt being acknowledged by the defendants or someone in their behalf.

The defendants occupy a large one-story building with a full cellar underneath it. The building itself is in poor condition and the rear doors, some of which are metal, are ill-fitting, showing considerable daylight along their bottoms and sides so that the ingress of rodents from the outside is permitted. These doors have been in this condition for a long period of time. The floors of the retail area and of the rear processing rooms are in poor condition. There is considerable evidence of broken tiles, worn conditions, dirt, filth, and rodent droppings. The wooden floor of a meat refrigerator was separated, cracked and encrusted with a buildup of dirt. A meat grinder had an internal buildup of dirt, indicating failure to clean it at frequent intervals. The meat processing room was deteriorated, had a cracked hole in the floor, an encrustation of dirt, and other evidences of buildup of filth. The meat-cutting benches were cracked and split with adhering dirt. The wall behind them was wood and contained dirt, stains and chipped paint. The same was true of a metal back wall.

A milk display case had a dirty floor with dry and spilled milk that had all the appearance of having been there a long time. The dairy case had adhering dirt and stains in it of long duration. Grocery shelves contained dust and adhering dirt. The broken tiles on numerous areas of the floor permitted the buildup of dirt and dust and had not been cleaned recently. Behind spot display racks there was considerable dust, dirt, and filth that obviously had been there for a long period of time. A conveyor belt from the cellar to the first floor was filthy, containing a very heavy buildup of dirt that had been there for many months. The basement stairs themselves were in the same condition. In the meat-processing room there was a considerable buildup of dirt and dust on the ceiling around the air blower.

Other instances of similar dirt and filth conditions were numerous. The basement contained a considerable amount of unused furniture and equipment stored in piles in many areas against walls and in corners. Cleaning had occurred so infrequently that cobwebs, dirt and dust had accumulated in some of the cellar areas. Cans and bottles were strewn upon the floor in several instances, with old dirty sawdust also in evidence. Broken boxes of food were scattered around the cellar. "Off condition" meat which had spoiled was stored in the meat refrigerator, and there was some in the display case for retail sales. Fresh unsmoked meat was discolored, slimy, sticky, and had a putrid odor. Some pork shoulders, hams, pork steak, and smoked pork contained mold and slime. These meats were voluntarily destroyed by the defendants by placing them in a barrel and having bleach poured on them. The defendants signed a statement for the destruction of these off-condition meats.

A floor drain in the basement facing the stairs had two or three pipes dripping into it with a

scummy substance covering the drain and a foul odor emanating from the drain. Along the front wall there was a hole leading to the next area which contained compressors used in the business. A produce wrapping machine was dusty and dirty. In the front area of the basement along the wall were located small black pellets, later identified on trial as rodent droppings. One hundred and twenty pounds of beef trimmings, discolored, sticky and putrid, and thirty pounds of pork fat and trimmings were all off-condition and voluntarily destroyed. The produce refrigerator had a black substance on its wall which was fuzzy and hairy and similar to thick, heavy dust. Many fruit items appeared badly bruised to the point where the skin was broken and the insides were leaking out, and oranges and grapefruits also contained mold as a greenish substance. Peppers had black spots on them and were shriveled. Bananas were black, dried, and broken.

The report of the first inspection was shown to the defendant Abraham L. Giles. He signed a receipt for it and did not deny any of the items noted in the report. Subsequent inspections elicited essentially the same general conditions with little or no improvement and in some cases greater deterioration. On at least one occasion, water was found dripping from the ceiling over the cereal display area, and cereals had to be moved from under the dripping water. The men's toilet room was found to be filthy. The small black pellets were in evidence on subsequent inspections of the premises. In some cases packages of liver appeared to be thawed and refrozen, and water was found dripping from an air blower in the meat-processing room. The meat-processing room was found to be too warm, anywhere from 65 to 70 degrees Fahrenheit when it should have been between 45 and 50 degrees Fahrenheit.

Many flies were always in evidence—some alive and some dead. Stationary meat hooks in the processing room had meat residue like old fat on them, as did the board to which they were fastened. On one occasion, in the meat-processing room, two smoked pork shoulders were in the sink, the sink was half full of discolored water, and there were several spots of mold on the pork. The floor drain in the walk-in produce refrigerator was blocked by dirt, and the storage rack had a three-inch buildup of dirt and decomposed produce matter behind it.

Large areas of distressed merchandise were kept in the basement, and several live roaches were found on the merchandise. A pool of water rested on the basement floor. Photographs were introduced showing many of the conditions narrated above. Even after the papers in this case were served on the defendants, little improvement occurred, as evidenced by the inspections that followed. As late as the last inspection before trial on November 8, the general conditions described above remained substantially the same.

On November 13 a partial inspection of the premises, resulting in some photographs, indicated that the entire length of the windowsill along Albany Avenue was filthy with an accumulation of dead flies and other insects, pieces of paper, dirt, and dust that obviously had not been cleaned in many months. The stretch of the building along Albany Avenue is approximately 100 feet or more in length.

Most of the items indicated above were observed by the court upon its inspection of the premises.

Abraham L. Giles had operated a small store on Clark Street until January, 1972. He conceded that while operating that small food business he did have complaints concerning its sanitary conditions. He

indicated that he was in charge of the defendant corporation's grocery department and tried to get the personnel working for the defendants to comply with the reports being filed by the inspectors of the consumer protection department in order to clean up the premises. The defendants had, during the period in question, a total of fifteen employees with a considerable turnover of help. The defendants admitted that they had difficulty in hiring adequate employees because "no one really wants to work." This is a malaise quite prevalent among people who have become brainwashed and propagandized into believing that government is "big brother" and that in a welfare state no one needs to work because "someone else" will take care of him.

The defendant corporation's gross income per week in 1971 was approximately $23,000. From January to June, 1972, it dropped to approximately $19,000 per week and in November, 1972, it had dropped to $11,000 per week. While there are several other supermarkets within a quarter of a mile, none of them carries the number of items that this business does. Nevertheless the defendant corporation experienced a serious drop in income. The defendant Giles admitted that he had plugged with glass and cement "all rat entries" just about a week before trial.

In April, 1972, Giles testified that he had told the deputy commissioner at a hearing that he, Giles, was trying to make improvements. On June 1 Giles had a study done of the business for which he received a report and was told that the business needed expensive advertising to improve it, more help, more money, and more housekeeping. Giles admitted that something was always happening to the roof of the building which caused it to leak and that, although he used an exterminating company once a month or whenever it was called, at no time

had he contacted it to plug up any ratholes. He claimed that he had never seen any rats inside the building at night but did see them outside, some 200 feet away, at a garage on the side of the street at the end of his parking lot. He also had seen two dead rats about seventy-five feet from his building.

A business consultant employed by the defendants indicated that the latest balance sheet of the corporation showed no net income and a net loss of approximately $50,000. Recommendations made by the consultant were not completed for lack of funds. The consultant admitted that the business needed more money, redecoration, new equipment, repairs, a new rear exit to the parking lot, and a new floor in the retail area and the working area. For the purposes of this memorandum other details need not be enumerated.

## II

Although the state has chosen the form of setting out the violations of the Connecticut Food, Drug and Cosmetic Act on the basis of six separate counts, it is apparent that the course of conduct involved here is a continuous one starting at least as far back as the first inspection on March 29 and continuing up to the moment of trial. In considering whether an injunction should issue and, if it should, what form it should take, the court must keep in mind this continuous course of conduct. It is also significant that this conduct persisted although each inspection brought forth a separate report, acknowledged by the defendant, showing that substantially the same condition remained in existence over the entire period of time in question.

It is quite apparent that the defendants have been unable to operate this supermarket in a manner that complies with the Connecticut Food, Drug and

Cosmetic Act and, all things remaining equal, are unlikely to be able to do so in the future. They lack sufficient capitalization, the knowledge necessary to handle a large supermarket, the proper equipment, a modern building within which to operate, and a sufficient staff of employees who are willing to work hard and know what to do when they are working. It is particularly significant that Giles, even when he operated a very small grocery store on Clark Street just prior to his purchase of this supermarket, had trouble maintaining it in a sanitary fashion. The defendants are presently insolvent and, as far as the business is concerned, on the verge of bankruptcy. This is sad and unfortunate for a gentleman like Giles, who as a member of a minority group has sought to establish himself as a large supermarket operator and has found that he has bitten off more than he can chew. The fact is, however, that the conditions existing in the store are a threat to the health and welfare of the consumer public and must be made to comply with the law for the protection of the public.

Under General Statutes § 19-213 (a), the sale of any food that is adulterated is forbidden. It is deemed to be adulterated if it is prepared or held under insanitary conditions whereby it may have become contaminated with filth. §§ 19-221 (a) (4), 19-212 (c). This can occur when food is not securely protected from dust and dirt and, within reasonable bounds, from foreign contaminations. The narration of the facts set forth above does not require repetition to demonstrate that the conditions found on the defendants' premises for at least the period of time from March 29 to the date of this hearing mesh clearly into the prohibitory language of the cited sections of law.

The nature of relief to be granted is the only real question confronting the court. Under General

Statutes § 19-214[1] injunctive relief is permitted to restrain violations of § 19-213. The Connecticut act must be interpreted to be uniform with the Federal, Food, Drug, and Cosmetic Act. See 21 U.S.C. §§ 301–392; General Statutes §§ 19-239, 19-212 (h). Our § 19-213 is similar to 21 U.S.C. § 332, which provides the federal District Courts with jurisdiction "to restrain violations" of the federal act.

In *United States* v. *Lit Drug Co.*, 333 F. Sup. 990, the court imposed a restraint upon interstate drug shipments until the government was satisfied that the defendants' plant operation conformed to "current good manufacturing practices." The defendants contended this injunction exceeded the bounds of 21 U.S.C. § 332, as did the portion restraining interstate shipment of drugs until all drugs in the plant were assayed and defective lots recalled to be destroyed. The court rejected the defendants' attempt to limit the form and scope of the injunction and ruled that the act had to be broadly construed to effectuate its liberal purpose because public interest was paramount. The defendants' persistent failure to comply with the law warranted the injunction's breadth. Congressional intent did not contemplate a narrow construction of the act. Id., 997–98. The decree must be molded to fit the specific public interest to be served, and the history of repetitive violations makes very real the danger of recurrent future violations. Excuses and alibis however well-intentioned are no substitute for compliance with the law where the public health and welfare are involved. See also *Securities &*

---

[1] "Sec. 19-214. INJUNCTION PROCEEDINGS. In addition to the remedies hereinafter provided, the commissioner is authorized to apply to the superior court for, and such court shall have jurisdiction upon hearing and for cause shown to grant, a temporary or permanent injunction restraining any person from violating any provision of section 19-213, irrespective of whether or not there exists an adequate remedy at law."

*Exchange Commission* v. *Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1307, where a broad interpretation is given the Securities Exchange Act of 1934 (which authorizes injunctions to stem violations; 15 U.S.C. § 78u [e]) to permit an ancillary order of restitution.

The existence of the amount of accumulated filth in the variety of manifestations exhibited on the premises of the defendants here was sufficient to establish a prima facie case, and the defendants offered no evidence worthy of credit to contravene the state's case. The kind of operation observed by the court and supported by witnesses' testimony sufficiently establishes an imminent hazard to public health. It is reasonably clear that the defendants should not be operating this supermarket in its present condition, and probably should not be allowed to operate it in the future without many radical changes.

The litigants are at odds as to who is the proper party to institute an injunction proceeding. Section 19-214 authorizes the commissioner of consumer protection to apply for injunctions, but § 19-219 expressly provides that "proceedings for the enforcement, or to restrain violations, of . . . [the act] shall be by and in the name of the state of Connecticut." In the instant case it is really immaterial whether the commissioner applied for the injunction under § 19-214 or not. The action was instituted in the name of the state, and any action taken by the commissioner would necessarily have to be taken in behalf of the state likewise, although she might have been the nominal plaintiff in her official capacity.

As expressed in *Hammerberg* v. *Leinert*, 132 Conn. 596, 604, where the only reasonable conclusion upon the facts is that the plaintiff is entitled to an injunction, the denial of it may amount to an

abuse of discretion. This is particularly true where there is a strong public interest to be protected. *Dimmock* v. *New London*, 157 Conn. 9, 19.

The court therefore finds the issues in favor of the plaintiff and orders a temporary injunction, the specific terms of which shall follow the language of the proposed temporary injunction submitted for consideration by the plaintiff in November, but adding to it a provision that the defendants shall refrain from keeping the premises in the future in the same condition as is proscribed by the terms of the injunction as to past violations and that the defendants' premises shall not be open to the public for the sale of merchandise until there is full compliance with the injunctive provisions and until the premises pass inspection by the consumer protection department; and that the injunction shall issue without bond to prosecute from the plaintiff but upon a penalty of $25,000 for failure to comply by the defendants, their officers, servants, agents, and employees.